FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

13 JUL 25 PM 1:48

TRANSATLANTIC, LLC,

          Plaintiff

vs.

HUMANA, INC.,
HUMANA INSURANCE COMPANY,
HUMANA HEALTH INSURANCE COMPANY OF FLORIDA, INC.,
HUMANA MEDICAL PLAN, INC.,
PCA FAMILY HEALTH PLANS OF FLORIDA, INC.,
PCA FAMILY HEALTH PLAN, INC.,
PCA LIFE INSURANCE COMPANY, and
EMPLOYERS HEALTH INSURANCE COMPANY,

          Defendants.
_____/

Case No.

8:13 cv 1925 T 30 TBM

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiff, TRANSATLANTIC, LLC, (hereinafter "TRANSATLANTIC") by and through its undersigned counsel and sues the Defendants, HUMANA, INC., HUMANA INSURANCE COMPANY, HUMANA HEALTH INSURNACE COMPANY OF FLORIDA, INC., HUMANA MEDICAL PLAN, INC., PCA HEALTH PLANS OF FLORIDA, INC., PCA FAMILY HEALTH PLAN, INC., PCA LIFE INSURANCE COMPANY, and EMPLOYERS HEALTH ISNURANCE COMPANY (collectively "HUMANA") and would allege as follows:

## GENERAL ALLEGATIONS

1.     This is an action for damages in excess of one million dollars.

2.     The jurisdiction of this Court lies under 28 U.S.C. §1331 in that this being a matter of a federal question at issue.

1

TPA-18534
# 400

3.   This Court has jurisdiction and authority to issue a Writ in the form of injunctive relief in aid of its jurisdiction under 28 U.S.C. §1651.

4.   Plaintiff TRANSATLANTIC, LLC is a Florida Limited Liability Company.

5.   HUMANA, INC. is incorporated in Delaware, is headquartered in Louisville, Kentucky, and conducts business in the state of Florida.

6.   HUMANA INSURANCE COMPANY is incorporated in Delaware and conducts business in the State of Florida.

7.   HUMANA MEDICAL PLAN, INC. is incorporated in Florida and conducts business in the State of Florida.

8.   HUMANA HEALTH INSURANCE COMPANY OF FLORIDA, INC, is incorporated in Florida and conducts business in the State of Florida.

9.   PCA HEALTH PLANS OF FLORIDA, INC. conducted business in the State of Florida during the period at issue and merged with HUMANA Medical Plans, Inc., a Florida Corporation, in 1998.

10.   PCA FAMILY HEALTH PLAN, INC. conducted business in the State of Florida during the period at issue and merged with HUMANA Medical Plans, Inc., a Florida Corporation, in 1998.

11.   PCA LIFE INSURANCE CO., conducted business in the State of Florida during the period at issue and merged with HUMANA Health Insurance Co., a Florida Corporation, in 1998.

12.   EMPLOYERS HEALTH INSURANCE COMPANY OF FLORIDA, INC. conducted business in the State of Florida during the period at issue and changed its name to HUMANA INSURANCE COMPANY in 2001.

13.    HUMANA, INC., HUMANA INSURANCE COMPANY, HUMANA HEALTH

INSURANCE COMPANY OF FLORIDA, INC., HUMANA MEDICAL PLAN, INC.,

PCA FAMILY HEALTH PLANS OF FLORIDA, INC., PCA FAMILY HEALTH

PLAN, INC., PCA LIFE INSURANCE COMPANY, and EMPLOYERS HEALTH

INSURANCE COMPANY and their affiliates [jointly and severally known hereinafter

as HUMANA], administer the Medicare Part C program for individuals who reside in

the state of Florida. CMS contracted with HUMANA to receive, adjudicate, process, and

pay certain Parts A, B, and D claims, as an MAO. Each HUMANA entity listed above is

an agent for each other.

14.    HUMANA jointly and severally are named Defendants herein.

15.    HUMANA transacts business in the State of Florida and administers its CMS programs

for residents, providers and IPAs of the State of Florida out of its offices located in the

State of Florida.

16.    The above referenced affiliates are jointly and severally known hereinafter as HUMANA

and administer by contract with CMS the Medicare Part C program for individuals who

reside in the state of Florida. CMS has contracted with HUMANA to receive, adjudicate,

process, and pay certain Parts A, B, and D claims.

17.    Each above referenced HUMANA entity is doing business in the State of Florida.

18.    HUMANA is a Medicare Advantage Organization [MAO] which has had a contract with

TRANSATLANTIC, LLC to render services under and pursuant to the Medicare MAO

Part C Program. [**Attachment A**]

19.    TRANSATLANTIC, LLC is a Limited Liability Corporation MSO/IPA which is

incorporated in Florida and doing business in Tampa, Florida and has downstream

contracts [subcontracts] with various medical groups to render services under the Medicare Part C program.

20.   Federal funds are used to pay under this contract.

21.   Over a million dollars of federal funds is being illegally held by HUMANA without an accounting.

22.   If this Court does not issue a Temporary Restraining Order, Preliminary and Permanent Injunction, there may be available no corporate entity able and willing to related the substance of HUMANA's transgressions against the federal fisc. Furthermore, the injuries will be irreparable.

23.   The Medicare program is a federal health care program providing benefits to persons who were over the age of 65 or disabled [Title XVIII of the Social Security Act; 42 USC 1395 et seq.]. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

24.   Medicare is a "health care benefit program," that is provided under Parts A, B, C and D as set out by Title 42, United States Code, Sections 1395c; 1395j; 1395w-21 and 1395w-101.

25.   The relevant time for this Complaint is from on or about February 6, 2006, to the present.

<u>The Medicare Program</u>

26.   The Medicare program includes coverage under three primary components, hospital insurance ("Part A"), medical insurance ("Part B") and drug insurance ("Part D"). Part B of the Medicare program covers the cost of physicians' services and other ancillary services not

4

covered by Part A. Part D covers the costs of most drugs and medicines on an outpatient basis. Part C covers the administration of managed care of the other programs which were traditionally fee for service and which is still available.

27. Part C provides Medicare managed care programs that are administered by entities known as Medicare Advantage Organizations (MAO). MAOs are under contract to CMS and have downstream contracts with subcontractors, called Managed Service Organizations (MSO) under various names such as Managed Service Organizations, Independent Practitioners Association (IPA) as well as other names. These MSOs in turn have contracts with other MSOs and/or Physician Practices and/or Physician Groups. All of these downstream entities are contractually bound to the terms and conditions established by the MAOs contract with CMS, Medicare's regulations and statutes and such other contract terms as are consistent with the Medicare program and the laws and Constitution of the United States of America. These sub-entities are First Tier, Second Tier, Third Tier subcontractor entities based upon how many contracts away from the MAO the subcontractor is.

28. Payments under the Medicare Part C program are regularly made by the CMS to an MAO. The MAO receives a percentage for its expenses and profits. The MAO in turn then pays for services rendered to its First Tier Downstream entities with which it is directly contracted. The First Tier Downstream IPA, such as TRANSATLANTIC, earns money from the funds paid to its Downstream  entities. Similarly, that First Tier Downstream entity pays its downstream sub-entities [Second Tier Downstream, Third Tier Downstream, etc.] as well as its' direct services providers until the Medicare reimbursement reaches the service provider who renders the services, rather than to a

beneficiary. This occurs when the provider submits a claim to Medicare for payment, through its up-steam entities. These claims are paid either on a fee for service basis or on a capitated basis. If the service provider is not a capitated entity/provider, then the service is paid on an individual fee for service basis. This type of billing often occurs with Specialists who have not accepted capitated reimbursement. If the service provider is compensated as a downstream provider on a capitated basis, then fees are set and paid based upon the complexity of the patient's healthcare status as determined by the physician's diagnosis arising from patient encounters, lab reports and other basis of information, such as Specialist reports. These capitated fees are paid to the physicians on a monthly basis.

29.     Upon certification, the medical provider, whether a clinic, individual, or other health care provider that provided services to Medicare beneficiaries, is able to apply for a Medicare Provider Identification Number ("PIN") for billing purposes. A health care provider who was assigned a Medicare PIN and provided services to beneficiaries was able to submit claims for reimbursement to the Medicare contractor/carrier that includes the PIN assigned to that medical provider. A Medicare claim is required to set forth, among other things, the beneficiary's name, the date the services were provided, diagnosis codes of the patient's medical condition, the cost of the services, and the name and identification number of the physician or other health care provider who had ordered and/or rendered the services. When an individual medical provider is associated with a clinic, Medicare Part B requires that the individual provider number associated with the clinic be placed on the claim submitted to the Medicare contractor.

30.     By becoming a MAO, MSO, IPA, or participating provider in Medicare, entities agree to

abide by the policies and procedures, rules, and regulations governing Medicare reimbursement and the programs. To receive Medicare funds, participating entities, together with their authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care entities are given and/or provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

31.   Providers can only submit claims to Medicare for services that they rendered except that capitated fees are set per enrolled patients based upon the complexity of their medical condition as specified by diagnostic codes. Medicare regulations require MAOs, MSOs and health care providers contracted with Medicare to maintain and cause to be maintained complete and accurate patient medical records to verify that the services were provided as described on the claim form. These records are required to be sufficient to permit Medicare and its contractors, to review the appropriateness of Medicare payments made to the health care provider under Medicare.

32.   When providers identify additional information through subsequently reported test results or otherwise that would change a patient's diagnosis or treatment plan, the provider is required to update his clinical charts and appropriately adjust any reimbursement documentation without any undue delay.

33.   Under Medicare, services provided are required to be reasonable and medically necessary for the treatment or diagnosis of a beneficiary's illness or injury.

34.   To receive reimbursement for a covered service from Medicare, a provider is

7

required to submit a claim, either electronically or using a form *(e.g.,* a CMS-1500 form or UB92) containing the required information appropriately identifying the provider, patient, services rendered and diagnosis. This is whether or not the provider is being reimbursed under a capitated program or a fee for service program.

35.    HUMANA has established a rule that after 30 days a physician cannot correct his patients' medical records or billing records as to a patient's diagnosis unless the physician has the patient return for a second visit and then it is only prospectively.

36.    This can cause overcharging or undercharging of CMS via Medicare reimbursement for a capitated fee for a primary care physician.

37.    This can even cause overcharging of CMS via Medicare reimbursement for a fee for service specialist who is seeing the patient based upon an incorrect diagnosis of the primary care physician.

38.    Medicare requires that when errors are identified that they are promptly corrected whenever it is determined and a patient's return visit cannot be a precondition for the correction.

39.    HUMANA's record correction protocol causes incorrect and inaccurate Medicare reimbursement and inconsistent chart documentation.

40.    HUMANA's protocol even requires the maintenance of incomplete and inaccurate progress notes.

41.    TRANSATLANTIC has complained to HUMANA concerning this protocol and asked on several occasions for documentation supporting HUMANA's protocol.

42.    HUMANA has not provided to TRANSATLANTIC supporting documentation for this protocol.

43. HUMANA has undertaken adjustments against Medicare funds of TRANSATLANTIC's downstream affiliated physician centers' (subcontractors) by withholding reimbursement of funds on the basis of alleged inappropriate coding by these downstream affiliated centers.

44. HUMANA has withheld over one million dollars of TRANSATLANTIC's and its downstream providers' funds on the basis of the alleged inappropriate coding.

45. TRANSATLANTIC denies the alleged inappropriate coding by its affiliated physician centers.

46. TRANSATLANTIC has sought and received no confirmation that HUMANA has return the withheld funds or the interest accumulated on the funds to CMS and HUMANA has not returned the funds to TRANSATLANTIC or its downstream subcontractors.

47. Upon repeated requests, HUMANA has provided no documentation to TRANSATLANTIC that contradicts TRANSATLANTIC's understanding that HUMANA has retained the funds and interests for itself in the amount of over one million dollars.

48. It has been over one year since HUMANA undertook its adverse adjustment against TRANSATLANTIC's downstream affiliates' funds, which affects payments to TRANSATLANTIC.

49. On a number of occasions, TRANSATLANTIC's personnel have sought to confirm the status of these funds.

50. Based upon HUMANA's failure to respond, HUMANA has not returned these funds to CMS or TRANSATLANTIC nor has HUMANA accounted for these funds or the interest upon them.

51.    On or about August, 2010, HUMANA placed TRANSATLANTIC on a Corrective Action Plan. TRANSATLANTIC successfully completed its CAP with HUMANA.

52.    On or about March,2013, TRANSATLANTIC self reported to Dr. Scott Latimer, Market President, Senior Segment for HUMANA, that TRANSATLANTIC had previously, a number of years ago, committed a technical violation of the Part C Medicare Program in that it contracted a downstream physician group with more favorable financial treatment than is standard and it did not report the deviation contract provision to HUMANA even though it could have otherwise been written lawfully, according to Dr. Latimer, and if it had been appropriately disclosed. This more favorable treatment was as a result of arms length negotiations with this service provider and not due to any improper affiliation connection with TRANSATLANTIC. This inappropriate treatment resulted in financial costs to TRANSATLANTIC and not CMS.

53.    On or about April 25, 2013, HUMANA placed TRANSATLANTIC on a Corrective Action Plan [CAP] [Exh. #3] as a consequence of its failure to report in a timely fashion the contract deviation.

54.    TRANSATLANTIC has not violated its CAP of April 25, 2013 and HUMANA has never alleged that TRANSATLANTIC violated its CAP of April 25, 2013, [Exhs. #5, 6 &10]

55.    TRANSATLANTIC has regularly sought a status report as to the reserve funds withheld by HUMANA as to whether they had been repaid to CMS.

56.    After having previously been placed TRANSATLANTIC on a CAP, on June 24, 2013, HUMANA terminated TRANSATLANTIC's contract under the guise of a Mutual Consent Termination Letter [Ex. #6] without the occurrence of any new cause or violation of the CAP.

57. Dr. Scott Latimer President Marketing Senior Segment of HUMANA arranged for a meeting with TRANSATLANTIC at the offices of HUMANA on June 24, 2013. Dr. Latimer informed TRANSATLANTIC that HUMANA would immediately terminate TRANSATLANTIC for cause or TRANSATLANTIC could enter a Mutual Consent to terminate and be given 60 days prior to the termination of its contract.

58. TRANSATLANTIC was taken by surprise and was not afforded an opportunity to consult with its counsel. It was a take it or leave it moment.

59. TRANSATLANTIC had not taken any contractual violation type of actions since being placed on its CAP of April 25, 2013, that would constitute cause.

60. TRANSATLANTIC was concerned about the disruption to its Downstream Subcontract Providers if termination was immediate and executed the 60 day Mutual Consent agreement.

61. HUMANA had no right under its contract with TRANSATLANTIC to terminate TRANSATLANTIC for cause without proper notice and opportunity to cure except if cause as defined in Attachment F of the contract between the two or after providing 180 days notice prior to renewal date or 90 days notice for an uncured material breach.

62. HUMANA did not consider the earlier actions which were subject of the CAP cause because the CAP constituted the cure between the parties.

63. On June 25, 2013, TRANSATLANTIC appealed to Dr. Latimer of HUMANA to reverse its termination.

64. On July 1, 2013, Dr. Latimer on behalf of HUMANA denied TRANSATLANTIC's appeal to reverse its termination.

65. In its July 1, 2013, letter to TRANSATLANTIC denying its request to reverse

TRANSATLANTIC's termination, HUMANA articulated the reason for the termination and they were all included in the self-disclosure by TRANSATLANTIC and known to HUMANA prior to entering the CAP with TRANSATLANTIC.

66. While this alleged Mutual Consent was executed by TRANSATLANTIC, it was coerced and not voluntary. This Mutual Consent was procured by fraud and deceit as well as coercion. HUMANA obtained this Mutual Consent pursuant to its motives and purposes which are contrary to public policy.

67. This termination was in retaliation for TRANSATLANTIC's continuous seeking the status of the over one million dollars that should have been returned in whole or part to TRANSATLANTIC, its downstream service providers and/or CMS but none to HUMANA.

68. This termination was in retaliation for TRANSATLANTIC's contesting HUMANA's illegal documentation correction protocol.

69. This termination was and is arbitrary and capricious.

70. HUMANA cannot act arbitrarily and capriciously while acting in the capacity of a government entity and contractor.

71. On or about February 6, 2006, TRANSATLANTIC entered into its IPA agreement with HUMANA [Exh. # 12].

72. Paragraph 20 [IPA-SR-FL/5-98] of that documents affords IPAs a grievance and appeals process.

73. Paragraph 20 is illusory for such a process has not been published in HUMANA's IPA manuals and documentation for IPAs.

74. TRANSATLANTIC could not implement that grievance and appeal process when

HUMANA sought the termination of its IPA agreement because that process does not exist.

75. Not having a published process in place when by contract it is suppose to exist, is arbitrary and capricious.

76. On July 2 and July 5, 2013, [Exhs. #8 & 9] TRANSATLANTIC's counsel wrote HUMANA and sought to pursue TRANSATLANTIC's appeal rights and arbitration rights as to the legitimacy of HUMANA's termination of TRANSATLANTIC's IPA contract with HUMANA as set out in HUMANA's IPA contract with TRANSATLANTIC.

77. On July 8, 2013, [Exh. #10] HUMANA's counsel wrote and asserted that it would continue its present course upon which it alleged that both parties agreed and it would not be instituting any appellate or arbitration process.

78. HUMANA's response arbitrarily and capriciously assumed the conclusion of the appeal and/or arbitration process so as to not initiate either process.

79. HUMANA is acting on behalf of the government and is functioning as a government entity.

80. HUMANA cannot act arbitrarily and capriciously in its capacity of implementing its CMS contract.

81. HUMANA is acting arbitrarily and capriciously against TRANSATLANTIC by refusing to initiate either the appeal and/or arbitration process.

82. HUMANA owns in whole or part a downstream MSO/IPA subcontractor (ContinuCare) to whom it affords more favorable treatment in the implementation of the Medicare Part C Program to the detriment of other downstream subcontractors.

83. ContinuCare is a downstream MSO/IPA subcontractor of HUMANA.

84.    Metrahealth Care Management Corp (Metrahealth) owns ContinuCare and Metrahealth is owned in whole or part by HUMANA or its affiliates.

85.    When HUMANA terminated TRANSATLANTIC's downstream contract with HUMANA, it placed on notice the downstream providers and MSO/IPAs of TRANSATLANTIC that they needed to select another MSO/IPA under which to contract with HUMANA by July 15 [thereafter enlarged until the end of July officially while HUMANA staff continues to press for an early selection of and contracting with alternative MSO/IPAs than TRANSATLANTIC] or they would be reassigned to another MSO/IPA of HUMANA's selection or be discontinued totally from contracting with HUMANA and their patients reassigned to another IPA.

86.    On or about June 28, 2013, Mr. John Barger of ContinueCare (a Metrahealth owned entity) contacted Ms. Lari Cummings of TRANSATLANTIC by phone and informed her that ContinuCare was interested in picking up TRANSATLANTIC's downstream physician group subcontractors and staff centers. Mr. Barger was seeking Ms. Cummings' assistance. Mr. Barger advised that there could be a place for Ms. Cummings as an employee or independent contractor in and/or with ContinuCare if this transfer of patients occurred.

87.    Seeking TRANSATLANTIC's patients is an illegal incentive and basis for HUMANA to terminate TRANSATLANTIC's contract with HUMANA.

88.    TRANSATLANTIC's termination as a HUMANA IPA was in whole or part based upon HUMANA's desire to transfer TRANSATLANTIC's patients and downstream providers to the HUMANA owned [in whole or part] downstream MSO/IPA, ContinuCare.

89.    On or about February 6, 2006, TRANSATLANTIC and HUMANA entered a contract

[Exh. #12] providing for the provision of Medicare services under the terms and conditions of the contract, the Medicare program and the laws and Constitution of the United States of America.

90. HUMANA is acting as an agent of the United States of America in its implementation of this contract and the contract it entered with the United States of America as a Medicare Advantage Organization.

91. HUMANA has caused the termination of its contract with TRANSATLANTIC and is in the process of transferring and arranging the transfer of TRANSATLANTIC's IPA subcontractor and patients.

92. HUMANA has caused the termination of its contract with TRANSATLANTIC under the guise of a Mutual Consent Agreement [Exh. #6]. This termination was procured by fraud and deceit as well as coercion. HUMANA obtained this Mutual Consent Agreement pursuant to its motives and purposes contrary to public policy.

93. This termination was procured in retaliation for TRANSATLANTIC seeking documentation as to the proper disposition of over one million dollars withheld by HUMANA from TRANSATLANTIC and its subcontractors and/or CMS; TRANSATLANTIC challenging HUMANA's illegal documentation policy; and HUMANA seeking for ContinuCare [its subsidiary] TRANSATLANTIC's patients.

94. Under the circumstances of this case, HUMANA is doing the above in contradiction and breach of the terms and conditions, explicit and implied, of the contract entered with TRANSATLANTIC on February 6, 2006.

95. Under the circumstances of this case, HUMANA is doing the above in contradiction and breach of the terms and conditions, explicit and implied, of the contract entered with

TRANSATLANTIC on February 6, 2006, [Exh. #12] including but not limited to Attachment F [Exh. #4] which provides for the term of the contract and cure for breach thereof.

96.    Under the circumstances of this case, HUMANA is doing the above in contradiction and breach of the Corrective Action Plan [Exh. #3] entered under and the terms and conditions, explicit and implied, of the contract entered with TRANSATLANTIC on February 6, 2006, including but not limited to Attachment F which provides for the term/termination of the contract and cure for breach thereof.

97.    Under the circumstances of this case, HUMANA is doing the above in contradiction of the Medicare program, the regulations and statutes governing the Medicare program, and the statutes, regulations and Constitution of the United States of America.

98.    HUMANA is causing TRANSATLANTIC's subcontractors to select alternative IPAs by the 15th of July and the latest by July 31.

99.    HUMANA is causing TRANSATLANTIC's subcontractors to be administratively processed so as to implement the Medicare program by September 1, 2013, with these subcontractors but through IPA/MSOs other than TRANSATLANTIC with whom they are currently contracted with.

100.    Under the circumstances of this case, HUMANA is not entitled under the contract, applicable Medicare program provisions and regulations and statutes, the Constitution, laws and regulations of the United States of America, to undertake the above.

## CLAIM I: DECLARATORY JUDGMENT

101.    Plaintiff re-alleges and incorporates Paragraphs 1 through 100 above as if fully set forth and recited herein.

102. On information and belief, HUMANA and its agents have acted with reckless disregards of its obligations under its Medicare Advantage Contract and the Medicare Program.

103. On information and belief, HUMANA and its agents have acted with intent to defraud the United States.

104. On information and belief, HUMANA and its agents have acted in violation of its due care obligations under the Medicare program and its Medicare Advantage Contract.

105. An actual controversy therefore exists between TRANSATLANTIC and HUMANA as to whether HUMANA may undertake the above actions under the circumstances of this case and under the contract, applicable Medicare program provisions and regulations and statutes, the Constitution, laws and regulations of the United States of America.

**WHEREFORE,** Plaintiff TRANSATLANTIC requests that this Court enter its judgment declaring that HUMANA is not entitled under the contract with TRANSATLANTIC to undertake the above alleged actions; including but not limited to termination of this contract, transferring patients and subcontractors from TRANSATLANTIC; and grant such other relief as the Court deems appropriate. Plaintiff TRANSATLANTIC demands trial by jury on all issues so triable.

## CLAIM II: ACCOUNTING

106. Plaintiff re-alleges and incorporates Paragraphs 1 through 100 above as if fully set forth and recited herein.

107. On information and belief, HUMANA and its agents have acted with reckless disregards of its obligations under its Medicare Advantage Contract and the Medicare Program.

108. On information and belief, HUMANA and its agents have acted with intent to defraud the United States.

109. On information and belief, HUMANA and its agents have acted in violation of its due care

obligations under the Medicare program and its Medicare Advantage Contract.

110. As a result of the aforementioned events set out in Paragraphs 1 through 100, HUMANA has received money, a portion of which is due to TRANSATLANTIC from HUMANA, as previously alleged.

111. HUMANA's termination of TRANSATLANTIC's contract was procured in retaliation for TRANSATLANTIC seeking documentation as to the proper disposition of over one million dollars withheld by HUMANA from TRANSATLANTIC and its subcontractors and/or CMS; TRANSATLANTIC challenging HUMANA's illegal documentation policy; and HUMANA seeking for ContinuCare [its subsidiary] TRANSATLANTIC's patients.

112. The specific amount of money due from Defendants to Plaintiff and others is unknown to Plaintiff and cannot be ascertained without an accounting of the withheld funds of the aforementioned events. Plaintiff believes and alleges that the amount due to Plaintiff and Plaintiff's downstream entities exceeds One Million Dollars.

113. Plaintiff has requested on a number of occasions an accounting of the aforementioned withheld funds from Defendants but Defendants have failed and refused, and continue to fail and refuse, to render such an accounting and to pay such sum.

**WHEREFORE,** Plaintiff prays judgment against Defendants HUMANA and each of them, as follows:

(1) For an accounting between plaintiff, its Downstream Entities, CMS and defendants HUMANA;

(2) For the amount found to be due from defendants HUMANA to plaintiff as a result of the accounting and interest on that amount from and after DefendantsHUMANA withheld the funds of Plaintiff and its Downstream subcontractors;

(3) For costs of suit herein incurred;

(4) For such other and further relief as the court may deem proper; and

(5) Trial by jury on all issues so triable.

### CLAIM III: BREACH OF CONTRACT

114. Plaintiff TRANSATLANTIC re-alleges and incorporates Paragraphs 1 through 100 above as if fully set forth and recited herein.

115. As a result of the aforementioned events set out in Paragraphs 1 through 100, HUMANA has received money, a portion of which is due to Plaintiff from Defendants, as previously alleged.

116. On information and belief, HUMANA and its agents have acted with reckless disregards of its obligations under its Medicare Advantage Contract and the Medicare Program.

117. On information and belief, HUMANA and its agents have acted with intent to defraud the United States.

118. On information and belief, HUMANA and its agents have acted in violation of its due care obligations under the Medicare program and its Medicare Advantage Contract.

119. HUMANA's termination of TRANSATLANTIC's contract was procured in retaliation for TRANSATLANTIC seeking documentation as to the proper disposition of over one million dollars withheld by HUMANA from TRANSATLANTIC and its subcontractors and/or CMS; TRANSATLANTIC challenging HUMANA's illegal documentation policy; and HUMANA seeking for ContinuCare [its subsidiary] TRANSATLANTIC's patients.

120. Plaintiff TRANSATLANTIC and HUMANA did enter a Medicare downstream contract on or about February 6, 2006, [Exh. #12].

121. Pursuant to the contract and the Medicare program Plaintiff and its downstream

subcontractors were to receive an amount of money for services rendered pursuant to the Medicare program.

122.   Defendants HUMANA did breach said contract by failing to pay a sum of money as set out herein.

123.   On or about April 25, 2013, HUMANA entered with TRANSATLANTIC a Corrective Action Plan [CAP] [Exh. #3] as a consequence of its failure to report in a timely fashion a contract deviation. This CAP constituted a cure agreement pursuant to Attachment F of the February 6, 2006, contract entered between TRANSATLANTIC and HUMANA.

124.   The alleged Mutual Consent was executed by TRANSATLANTIC under coercion and not voluntary. It was without valid consideration. This alleged Mutual Consent was procured under fraud and deceit as well as coercion.

125.   The termination constituted a violation of the cure agreement [CAP] between HUMANA and TRANSATLANTIC and a violation of Attachment F of the February 6, 2006, contract between TRANSATLANTIC and HUMANA.

126.   By reason of Defendants HUMANA's breaches of said contract, Plaintiff TRANSATLANTIC and its subcontractors have sustained damages, including but not limited to the amount of over one million dollars withheld by Defendants HUMANA for services rendered by TRANSATLANTIC's subcontractors.

127.   TRANSATLANTIC and its subcontractors have performed all of the conditions precedent under the contract with HUMANA.

**WHEREFORE**, Plaintiff TRANSATLANTIC prays judgment against Defendants HUMANA in an amount to be determined [TBD] but not less than one million dollars, plus interest and costs of this action. Plaintiff TRANSATLANTIC demands trial by jury on all issues

so triable.

## CLAIM IV: INTEREFERENCE WITH CONTRACT AND ECONOMIC OPPORTUNITY

128.   Plaintiff TRANSATLANTIC re-alleges and incorporates Paragraphs 1 through 100 above as if fully set forth and recited herein.

129.   On information and belief, HUMANA and its agents have acted with reckless disregard of its obligations under its Medicare Advantage Contract and the Medicare Program.

130.   On information and belief, HUMANA and its agents have acted with intent to defraud the United States.

131.   On information and belief, HUMANA and its agents have acted in violation of its due care obligations under the Medicare program and its Medicare Advantage Contract.

132.   HUMANA's termination of TRANSATLANTIC's contract was procured in retaliation for TRANSATLANTIC seeking documentation as to the proper disposition of over one million dollars withheld by HUMANA from TRANSATLANTIC and its subcontractors and/or CMS; TRANSATLANTIC challenging HUMANA's illegal documentation policy; and HUMANA seeking for ContinuCare [its subsidiary] TRANSATLANTIC's patients.

133.   TRANSATLANTIC has had valid contracts with its Medicare subcontractors as to whom HUMANA is fully aware.

134.   HUMANA was aware of these subcontracts between TRANSATLANTIC and its Medicare subcontractors.

135.  These subcontracts were for the specific purpose of effectuating TRANSATLANTIC's Medicare contract entered into with HUMANA.

136.  HUMANA, not withstanding TRANSATLANTIC's subcontracts with these downstream entities and various economic opportunities with these downstream entities and other potential entities, intentionally induced some of these downstream entities to terminate their contracts with TRANSATLANTIC and acted to preclude other entities from affording TRANSATLANTIC economic opportunities.

137.  By reason of HUMANA's actions, TRANSATLANTIC has sustained compensatory damages of not less than ten million dollars and including an amount to be determined.

138.  By reasons of HUMANA's intentional wrongful actions and that the Defendants HUMANA are multi-billion dollar corporations, they should be assessed substantial punitive damages.

**Wherefore,** Plaintiff TRANSATLANTIC demands a judgment against Defendants HUMANA in an amount to be determined but not less than ten million dollars in compensatory damages and in an amount of one hundred million dollars for punitive damages, plus interest and the cost of this action.  Plaintiff TRANSATLANTIC demands trial by jury on all issues so triable.

## CLAIM V: DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS

139.  Plaintiff TRANSATLANTIC re-alleges and incorporates Paragraphs 1 through 100 above as if fully set forth and recited herein.

140.  On information and belief, HUMANA and its agents have acted with reckless disregards of its obligations under its Medicare Advantage Contract and the

Medicare Program.

141.   On information and belief, HUMANA and its agents have acted with intent to defraud the United States.

142.   On information and belief, HUMANA and its agents have acted in violation of its due care obligations under the Medicare program and its Medicare Advantage Contract.

143.   On information and belief, HUMANA violated clear Constitutional restrictions on the acts of the government and its agents.

144.   At all times during the period of this Complaint, HUMANA was acting as an agent of the United States and under the color of law.

145.   HUMANA terminated TRANSATLANTIC's Medicare Advantage contract with HUMANA.

146.   HUMANA deprived and sought to deprive TRANSATLANTIC of its contract rights without affording TRANSATLANTIC due process rights.

147.   HUMANA's termination of TRANSATLANTIC's contract was procured in retaliation for TRANSATLANTIC seeking documentation as to the proper disposition of over one million dollars withheld by HUMANA from TRANSATLANTIC and its subcontractors and/or CMS; TRANSATLANTIC challenging HUMANA's illegal documentation policy; and HUMANA seeking for ContinuCare [its subsidiary] TRANSATLANTIC's patients.

148.   HUMANA's termination of TRANSATLANTIC's Medicare contract did deprive and seek  to deprive TRANSATLANTIC of its contract rights without affording TRANSATLANTIC due process rights in clear violation of its Constitutional rights.

149. On or about April 25, 2013, HUMANA entered with TRANSATLANTIC a Corrective Action Plan [CAP] [Exh. #3] as a consequence of its failure to report in a timely fashion the contract deviation. This CAP constituted a cure agreement pursuant to Attachment F [Exh. #4] of the February 6, 2006, contract [Exh. # 12] entered between TRANSATLANTIC and HUMANA.

150. HUMANA's termination of its contract of February 6, 2006, with TRANSATLANTIC constituted a violation of the cure agreement [CAP] between HUMANA and TRANSATLANTIC and a violation of Attachment F of the February 6, 2006, contract between TRANSATLANTIC and HUMANA.

151. This constitutes a deprivation of contract and property rights without due process of law.

152. Paragraph 20 [IPA-SR-FL/5-98] of HUMANA's contract with TRANSATLANTIC affords IPAs a grievance and appeals process [Exh. #12].

153. Paragraph 20 is illusory for such a process has not been published in HUMANA's IPA manuals and documentation for IPAs.

154. TRANSATLANTIC could not implement that grievance and appeal process when HUMANA sought the termination of its IPA agreement because that process does not exist.

155. On July 2 and July 5, 2013, TRANSATLANTIC's counsel wrote HUMANA and sought to pursue TRANSATLANTIC's appeal rights and arbitration rights as to the legitimacy of HUMANA's termination of TRANSATLANTIC's IPA contract with HUMANA as set out in HUMANA's IPA contract with TRANSATLANTIC.

156. On July 8, 2013, HUMANA's counsel wrote and asserted that it would continue its

24

present course upon which it alleged that both parties agreed and it would not be instituting any appellate or arbitration process.

157. HUMANA's response arbitrarily and capriciously assumed the conclusion of the appeal and/or arbitration process so as to not initiate either process.

158. HUMANA is acting on behalf of the government and is functioning as a government entity

159. HUMANA cannot act arbitrarily and capriciously in its capacity of implementing its CMS contract.

160. HUMANA is acting arbitrarily and capriciously against TRANSATLANTIC by refusing to initiate either the appeal and/or arbitration process and is depriving TRANSATLANTIC its property rights without due process of law.

**Wherefore**, Plaintiff TRANSATLANTIC demands a judgment against Defendants HUMANA in an amount to be determined, plus interest and the cost of this action and such other relief as the Court determines to be appropriate. Plaintiff TRANSATLANTIC demands trial by jury on all issues so triable.

## <u>CLAIM VI: INJUNCTIVE RELIEF</u>

161. Plaintiff re-alleges and incorporates Paragraphs 1 through 100 above as if fully set forth and recited herein.

162. This is an action for an *ex parte* temporary restraining order and subsequent temporary and permanent injunction.

163. On or about March 2013, TRANSATLANTIC self reported to Dr. Scott Latimer, Market President, Senior Segment for HUMANA, that TRANSATLANTIC had previously, a number of years ago, committed a technical violation of the Part C

Medicare Program in that it contracted a downstream physician group with more favorable financial treatment than is standard and it did not report the deviation contract provision to HUMANA even though it could have otherwise been written lawfully, according to Dr. Latimer, and if it had been appropriately disclosed. This more favorable treatment was as a result of arms length negotiations with this service provider and not due to any improper affiliation connection with TRANSATLANTIC. This inappropriate treatment increased the financial costs to TRANSATLANTIC and not CMS.

164. On or about April 25, 2013, HUMANA entered with TRANSATLANTIC a Corrective Action Plan [CAP] [Exh. #3] as a consequence of its failure to report in a timely fashion the contract deviation. This CAP constituted a cure agreement pursuant to Attachment F [Exh. #4] of the February 6, 2006, contract [Exh. #12] entered between TRANSATLANTIC and HUMANA.

165. TRANSATLANTIC has not violated its CAP of April 25, 2013.

166. TRANSATLANTIC has regularly sought a status report as to the reserve funds withheld by HUMANA as to whether they had been repaid to CMS.

167. On or about June 24, 2013, without a violation of the CAP, HUMANA's President of Senior Segment, Dr. Scott Latimer, having arranged for a meeting at HUMANA's offices with TRANSATLANTIC, did threatened to terminate TRANSATLANTIC's Medicare contract for cause if TRANSATLANTIC did not consent to a mutual termination. Dr. Latimer cited no new cause as a basis for the termination. This would be greatly disruptive for the physician groups which TRANSATLANTIC services. Alternatively, Dr. Latimer would afford TRANSATLANTIC 60 days prior

to termination under a mutual consent termination. However, he insisted on the termination and he had the authority to enforce the demand.

168. This alleged Mutual Consent was executed by TRANSATLANTIC under coercion and not voluntary. It was without valid consideration. This Mutual Consent was procured under fraud and deceit as well as coercion.

169. TRANSATLANTIC was taken by surprise and was not afforded an opportunity to consult with its counsel. It was a take it or leave it moment.

170. TRANSATLANTIC had not taken any contractual violation type of actions since being placed on its CAP of April 25, 2013, that would constitute cause.

171. This termination constituted a violation of the cure agreement [CAP] between HUMANA and TRANSATLANTIC and a violation of Attachment F of the February 6, 2006, contract between TRANSATLANTIC and HUMANA.

172. The February 6, 2006, Medicare agreement between HUMANA and TRANSATLANTIC purported in Paragraph 20 [IPA-SR-FL/5-98] of that the agreement to afford IPAs [like TRANSATLANTIC] a grievance and appeals process.

173. Paragraph 20 is illusory for such a process has not been published in HUMANA's IPA manuals and documentation for IPAs.

174. TRANSATLANTIC could not implement that grievance and appeal process when HUMANA sought the termination of its IPA agreement because that process does not exist.

175. HUMANA not having a published appeal and grievance process in place when by contract it is suppose to exist, is arbitrary and capricious as well as fraudulent and

deceitful.

176.   On information and belief, in addition to being a misrepresentation to TRANSATLANTIC as to its due process rights, it is a misrepresentation to CMS as well.

177.   HUMANA obtained this Mutual Consent with TRANSATLANTIC pursuant to its motives and purposes which are contrary to public policy.

178.   This termination was in retaliation for TRANSATLANTIC's continuous seeking the status of the over one million dollars that should have been returned in whole or part to TRANSATLANTIC, its downstream service providers and/or CMS but none to HUMANA.

179.   This termination was and is in retaliation for TRANSATLANTIC's contesting HUMANA's illegal documentation correction protocol.

180.   This termination was and is in an effort to secure TRANSATLANTIC's patients from its physician centers.

181.   This termination was and is arbitrary and capricious and without a modicum of due process.

182.   On July 2 and July 5, 2013, TRANSATLANTIC's counsel wrote HUMANA and sought to pursue TRANSATLANTIC's appeal rights and arbitration rights as to the legitimacy of HUMANA's termination of TRANSATLANTIC's IPA contract with HUMANA as set out in HUMANA's IPA contract with TRANSATLANTIC.

183.   On July 8, 2013, HUMANA's counsel wrote and asserted that it would continue its present course upon which it alleged that both parties agreed and it would not be instituting any appellate or arbitration process [Exh. #10].

184.  HUMANA's response arbitrarily and capriciously assumed the conclusion of the appeal and/or arbitration process so as to not initiate either process.

185.  HUMANA is acting on behalf of and is functioning on behalf of CMS as a government entity in implementing its MAO contract.

186.  HUMANA cannot act arbitrarily and capriciously and without due process in its capacity of implementing its CMS contract.

187.  HUMANA is acting arbitrarily and capriciously against TRANSATLANTIC by refusing to initiate either the appeal and/or arbitration process and by terminating TRANSATLANTIC.

188.  HUMANA's is taking step to speed up the termination of TRANSATLANTIC's downstream contracts even though HUMANA has ostensively extended until the end of July for the downstream service providers to select the IPA/MSO with whom they want to associate through on and after September 1.

189.  HUMANA staff is calling physician groups and pressuring them to make selections and sign agreements as to replacement IPA/MSO for the start of September.

190.  HUMANA staff is pressuring physician groups to make their selections and sign agreements by Friday, July 19th as to their replacement MSO/IPAs.

191.  On information and belief, various provider physician groups have already made selections and entered contracts with alternative IPA/MSOs.

192.  HUMANA is preparing to administratively change these IPA/MSOs associated with these service physician provider groups.

193.  In addition, the medical staff is being recruited from TRANSATLANTIC and TRANSATLANTIC's two direct physician clinics. On information and belief, this is

the result of HUMANA's efforts.

194.  On or about June 28, 2013, Mr. John Barger of ContinueCare (a Metrahealth owned entity) contacted Ms. Lari Cummings of TRANSATLANTIC by phone to set up a meeting with her to discuss a possible place for her as an employee or independent contractor in and/or with ContinuCare to recruit existing affiliates of TRANSATLANTIC to align with ContinuCare.

195.  ContinuCare is a downstream MSO/IPA subcontractor of HUMANA.

196.  Metrahealth Care Management Corp (Metrahealth) owns ContinuCare; and Metrahealth is owned in whole or part by HUMANA or its affiliates.

197.  Unless immediately enjoined HUMANA's actions will cause TRANSATLANTIC substantial and irreparable harm to TRANSATLANTIC which took years to develop.

198.  TRANSATLANTIC was taken by surprise and even though it had not taken any actions since being placed on its CAP of April 25, 2013, that would constitute cause, TRANSATLANTIC was concerned [among many other issues] about the disruption to its Downstream Subcontract Providers if termination was immediate and as a consequence, TRANSATLANTIC executed the 60 day Mutual Consent agreement.

199.  While this alleged Mutual Consent was executed by TRANSATLANTIC, it was coerced and not voluntary. This Mutual Consent was procured by fraud and deceit as well as coercion. HUMANA obtained this Mutual Consent pursuant to its motives and purposes which are contrary to public policy. TRANSATLANTIC was taken by surprise and was not afforded an opportunity to consult with its counsel. It was a take it or leave it moment.

200.  If the TRO is not issued, then HUMANA will go forward with transferring

TRANSATLANTIC's affiliated physicians. This process will destroy the relationship between TRANSATLANTIC and its physician affiliates. Confidence and trust that has taken years to develop will be destroyed and cannot be rebuilt. TRANSATLANTIC's reputation will be tarnish and that cannot be itemized in dollars and cents. These are the intangibles of business that cannot be computed and cannot be repaired. The farther that HUMANA moves the realignment of these relationships, then more irreparable damage that will be done. HUMANA will argue that once the affiliates sign new contracts that they cannot be breached. While this is a faulty argument, it is true that once the relationship between TRANSATLANTIC and its various affiliated physicians is severed by HUMANA's unlawful conduct, some affiliates are highly likely not to desire to return to TRANSATLANTIC due to misperceptions that will have arisen. The destruction of these relationships is irreparable. The lost relationships constitute lost opportunities for growth in a field of business in a fast evolving environment.

201.  Upon suit for a monetary judgment the very first thing that HUMANA will raise is absolute immunity as a government agent. If that does not prevail, then HUMANA will raise the issue of qualified immunity. Again, if that does not prevail, HUMANA will seek to raise higher standards of proof as to obtaining a judgment against it. HUMANA will seek to wrap itself in the same garb as a Medicare Administrative Contractor [MAC] with the need to establish "reckless disregard" or "intent to defraud" pursuant to 42 U.S.C. §1395kk-1. Additionally, HUMANA would seek to claim that it only has to follow a due care standard [42 C.F.R. §421.316]. All of this creates a real possibility that there can be no monetary recovery for

TRANSATLANTIC if it is systematically destroyed by HUMANA through its contract termination due to HUMANA's improper motives and purposes. This significant potential monetary immunity makes the injury realistically irreparable unless injunctive relief is issued.

202. TRANSATLANTIC is losing its key staff and HUMANA has even attempted to subvert its CEO, Pilar (Lari) Cummings through the enticements of ContinuCare via John Barger. TRANSATLANTIC is losing its physician at its physician centers and TRANSATLANTIC is losing its patients and reputation in the medical community. To the degree that these could otherwise be compensated for financially, with HUMANA being a governmental agent, it becomes very problematic that any compensatory damages can be gained.

203. When TRANSATLANTIC appealed its termination the very next day [June 25, 2013][Exh. 13#] after the alleged Mutual Consent Agreement for termination was executed [June 24, 2013][Exh. #6] between TRANSATLANTIC and HUMANA, HUMANA responded with a July 1, 2013, rejection letter from Dr. Latimer [Exh. #5]. This letter identified three reasons for TRANSATLANTIC's termination by HUMANA and all three had been previously disclosed to HUMANA by TRANSATLANTIC in its March 2013 meeting with HUMANA and were being cured by the Corrective Action Plan [Exh.#3] previously agreed to between the parties. Therefore, the alleged reasons for the termination given by Dr. Latimer in his July 1, 2013, letter to TRANSATLANTIC were, in fact, a pretextual concealment for the real reason for the termination of TRANSATLANTIC's contract. This contract is subject to termination for limited reasons [Exh.#4] except if it was not renewed as

specified in the agreement. The agreement provided for cure and that is what the CAP was. There was no violation of the CAP [See Exh.#3] so there was no lawful basis to terminate the contract. HUMANA has never asserted a breach of the CAP [Exhs. #5, 6 &10]. Indeed, HUMANA breached the CAP by forcing TRANSATLANTIC into the Mutual Consent termination agreement without cause. The real reason for the termination was due to TRANSATLANTIC's exercising its First Amendment Rights. TRANSATLANTIC has consistently sought through written and verbal communications to obtain an accounting from HUMANA as to the one million dollars of funds withheld from TRANSATLANTIC and its affiliated physicians [Exhs. # 1 & 2]. These funds either in whole or part belong to them or in part belong to CMS [government]. It has been two years since HUMANA withheld the funds and has not accounted for them. Because the reasons for the termination had already been satisfactorily resolved between the parties by the CAP, the excuse given by Dr. Latimer for the termination was just a pretext as is often done to cover wrongful action. Additionally, TRANSATLANTIC has on several occasions questioned the 30 day documentation rule that HUMANA has implemented contrary to CMS rules and procedures.

204.   Additionally, HUMANA by its actions is damaging TRANSATLANTIC's First Amendment Rights under the Constitution and that is considered an irreparable injury. TRANSATLANTIC has right to advocate, it has a right to petition its government and all other associated First Amendment Rights. To deprive TRANSATLANTIC of its First Amendment Rights is to undertake irreparable injury to TRANSATLANTIC. This is an additional irreparable injury.

**WHEREFORE,** TRANSATLANTIC request that this Court grant the following relief:

(1) Ex Parte Temporary Restraining Order prohibiting HUMANA any agent, or entity over which HUMANA exercises control from undertaking any actions to terminate or to facilitate the termination of its contract of February 6, 2006, [as amended] with TRANSATLANTIC;

(2) Ex Parte Temporary Restraining Order prohibiting HUMANA any agent, or entity over which HUMANA exercises control from undertaking any actions to transfer physicians and physician groups from TRANSATLANTIC; including but not limited to, inciting, causing, permitting or otherwise facilitating, encouraging, causing any actions directly or indirectly involved in the transfer of physician groups and patients from TRANSATLANTIC;

(3) Ex Parte Temporary Restraining Order prohibiting HUMANA, any agent, or entity over which HUMANA exercises control from inciting, causing any employee, agent, contractor, subcontractor, physician groups, client or patient of TRANSATLANTIC or any of its subcontractors to terminate or otherwise lessen or reduce their relationship with TRANSATLANTIC or its subcontractors and specifically, enjoining HUMANA to notify all parties to whom it advised that TRANSATLANTIC was being terminated as a HUMANA downstream MSO/IPA, that until further order of the Court, that determination has been rescinded;

(4) A Preliminary and subsequently a Permanent Injunction (a) prohibiting HUMANA from terminating of its contract of February 6, 2006, with TRANSATLANTIC; (b) permitting or otherwise facilitating, encouraging, inciting, causing any actions directly or indirectly involved in the transfer of physician groups and patients from TRANSATLANTIC; (c) reinstating TRANSATLANTIC's Medicare Advantage Downstream Physician contracts and

prohibiting HUMANA from approving transfer of TRANSATLANTIC's Downstream contractors and patients without further order of this Court;

(5) A Preliminary and subsequently a Permanent Injunction prohibiting HUMANA, any agent, or entity over which HUMANA exercises control from inciting any employee, agent, contractor, subcontractor, physician group, client or patient of TRANSATLANTIC or any of its subcontractors to terminate or otherwise lessen or reduce their relationship with TRANSATLANTIC or its subcontractors.

(6) A Judgment against and ordering Defendants HUMANA in an amount to be determined by this Court as an equitable judgment, plus interest and the cost of this action based upon an Accounting and such other relief as the Court determines to be appropriate.

Furthermore, Plaintiff TRANSATLANTIC demands trial by jury on all issues so triable.

Respectfully Submitted,

PILKA & ASSOCIATES, P.A.
Daniel F. Pilka
Florida Bar No. 442021
Dixie T. Brady
Florida Bar No. 57567
213 Providence Road
Brandon, FL 33511
Telephone: (813) 653-3800 • (863) 687-0780
Fax: (813) 651-0710
Attorneys for Plaintiff
Email: dpilka@pilka.com
       dbrady@pilka.com
       lwadsworth@pilka.com

Of Counsel:

LAW OFFICE OF KENNETH JOEL HABER, PC
Kenneth Joel Haber
12705 Fernberry Lane, Suite A
Boyds, MD 20841
Telephone: (301) 670-0016
Fax: (301) 948-3091
Email: kjhesq@haberslaw.com

## VERIFICATION

I, Pilar Cummings [Lari], pursuant to 28 USC 1746, do hereby swear and declare under penalty of perjury that, to the extent of the factual allegations in the foregoing Complaint, they are true and correct to the best of my information and belief.

Date: 7- 25 -2013

Pilar Cummings [Lari]
CEO TRANSATLANTIC, LLC

36