UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TRANSATLANTIC, LLC,

      Plaintiff             Case No.8:13-CV-1925-T-17EAK-TBM

vs.

HUMANA, INC.,
HUMANA INSURANCE COMPANY,
HUMANA HEALTH INSURANCE COMPANY OF FLORIDA, INC.,
HUMANA MEDICAL PLAN, INC.,
PCA FAMILY HEALTH PLANS OF FLORIDA, INC.,
PCA FAMILY HEALTH PLAN, INC.,
PCA LIFE INSURANCE COMPANY, and
EMPLOYERS HEALTH INSURANCE COMPANY,

      Defendants.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW, the Plaintiff, TRANSATLANTIC, LLC, (hereinafter "TRANSATLANTIC") by and through its undersigned counsel and sues the Defendants, HUMANA, INC., HUMANA INSURANCE COMPANY, HUMANA HEALTH INSURNACE COMPANY OF FLORIDA, INC., HUMANA MEDICAL PLAN, INC., PCA HEALTH PLANS OF FLORIDA, INC., PCA FAMILY HEALTH PLAN, INC., PCA LIFE INSURANCE COMPANY, and EMPLOYERS HEALTH ISNURANCE COMPANY (collectively "HUMANA") and would allege as follows:

## GENERAL ALLEGATIONS

1.  This is an action for damages in excess of forty five million dollars.

2.  The jurisdiction of this Court lies under 28 U.S.C. §1331 in that this being a matter of a

federal question at issue.

3.   The jurisdiction of this Court lies under 18 U.S.C. §1964 in that this being a Racketeering

Influenced and Corrupt Organization matter at issue.

4.   This Court has jurisdiction and authority to issue a Writ in the form of injunctive relief in

aid of its jurisdiction under 28 U.S.C. §1651.

5.   This Court has jurisdiction and authority to issue orders to prevent and restrain violations

of 18 U.S.C. §1962 pursuant to 18 U.S.C. §1964(a) and to minimize damages to Plaintiff.

6.   This Court has supplemental jurisdiction under 28 U.S.C. §1367(a).

7.   Venue lies with this Court under 28 U.S.C. §1391(b) and 18 U.S.C. §1965.

## PARTIES AND ENTERPRISE

8.   Plaintiff TRANSATLANTIC, LLC is a Florida Limited Liability Company.

9.   HUMANA, INC. is incorporated in Delaware, is headquartered in Louisville, Kentucky,

and conducts business in the state of Florida, which is engaged in and the activities of

which affect interstate and foreign commerce, and is a person for the purposes of 18

U.S.C. §1961, et. seq.

10.   HUMANA INSURANCE COMPANY is incorporated in Delaware and conducts

business in the State of Florida, which is engaged in and the activities of which affect

interstate and foreign commerce, and is a person for the purposes of 18 U.S.C. §1961, et.

seq.

11.   HUMANA MEDICAL PLAN, INC. is incorporated in Florida and conducts business in

the State of Florida, which is engaged in and the activities of which affect interstate and

foreign commerce, and is a person for the purposes of 18 U.S.C. §1961, et. seq.

12.   HUMANA HEALTH INSURANCE COMPANY OF FLORIDA, INC, is incorporated in

2

Florida and conducts business in the State of Florida, which is engaged in and the activities of which affect interstate and foreign commerce, and is a person for the purposes of 18 U.S.C. §1961, et. seq.

13.   PCA HEALTH PLANS OF FLORIDA, INC. conducted business in the State of Florida, which engaged in and the activities of which affected interstate and foreign commerce, during the period at issue and merged with HUMANA MEDICAL PLAN, INC., a Florida Corporation, in 1998 and is a person for the purposes of 18 U.S.C. §1961, et. seq.

14.   PCA FAMILY HEALTH PLAN, INC. conducted business in the State of Florida, which engaged in and the activities of which affected interstate and foreign commerce, during the period at issue and merged with HUMANA Medical Plans, INC., a Florida Corporation, in 1998 and is a person for the purposes of 18 U.S.C. §1961, et. seq.

15.   PCA LIFE INSURANCE CO., conducted business in the State of Florida, which engaged in and the activities of which affected interstate and foreign commerce, during the period at issue and merged with HUMANA Health Insurance Co., a Florida Corporation, in 1998 and is a person for the purposes of 18 U.S.C. §1961, et. seq.

16.   EMPLOYERS HEALTH INSURANCE COMPANY OF FLORIDA, INC. conducted business in the State of Florida, which engaged in and the activities of which affected interstate and foreign commerce, during the period at issue and changed its name to HUMANA INSURANCE COMPANY in 2001 and is a person for the purposes of 18 U.S.C. §1961, et. seq.

17.   HUMANA, INC., HUMANA INSURANCE COMPANY, HUMANA HEALTH INSURANCE COMPANY OF FLORIDA, INC., HUMANA MEDICAL PLAN, INC.,

PCA FAMILY HEALTH PLANS OF FLORIDA, INC., PCA FAMILY HEALTH PLAN, INC., PCA LIFE INSURANCE COMPANY, and EMPLOYERS HEALTH INSURANCE COMPANY and their affiliates [while distinct corporate entities are jointly and severally known hereinafter as HUMANA unless otherwise specified], administer the Medicare Part C program for individuals who reside in the state of Florida. CMS contracted with HUMANA to receive, adjudicate, process, and pay certain Parts A, B, and D claims, as a Part C Medicare Advantage Organization [MAO]. Each HUMANA entity listed above is an agent for each other.

18. For purposes of 18 U.S.C. §1962(a) and 18 U.S.C. §1962(b), HUMANA, INC, is the Defendant herein and the other above cited HUMANA affiliated corporations are the enterprise as defined at 18 U.S.C. §1961(4). These affiliated corporations are an association in fact for purposes of these violations and 18 U.S.C. §1961(4) and 18 U.S.C. §1962. The enterprise is engaged in and the activities of which affect interstate and foreign commerce.

19. For purposes of 18 U.S.C. §1962(c), HUMANA, INC., and each and every of its above cited HUMANA affiliated corporations are Defendants herein and jointly and severally constitute the enterprise as defined at 18 U.S.C. §1961(4). HUMANA, INC., and these affiliated corporations are an association in fact for purposes of this violation and 18 U.S.C. §1961(4) and 18 U.S.C. §1962. The enterprise is engaged in and the activities of which affect interstate and foreign commerce.

20. For purposes of 18 U.S.C. §1962(d), HUMANA, Inc, and each and every of its above cited HUMANA affiliated corporations are Defendants herein.

21. HUMANA, INC. transacts business in the State of Florida. HUMANA, INC. is engaged

in and the activities of HUMANA, INC., affects interstate and foreign commerce. HUMANA, INC., in conjunction with its affiliated corporations, administers its CMS programs for residents, providers and Independent Physicians Associations [IPAs] of the State of Florida out of its offices located in the State of Florida, as well as out of its offices located in Louisville, KY and elsewhere.

22. The above referenced affiliates, jointly and severally known with HUMANA, INC., as HUMANA, administer, by contract with CMS, the Medicare Part C program for individuals who reside in the state of Florida and HUMANA does business in the State of Florida, and HUMANA is engaged in and the activities of which affect interstate and foreign commerce. CMS has contracted with HUMANA to receive, adjudicate, process, and pay certain Parts A, B, and D claims, the funds and monies for which travel in interstate commerce via interstate wire transmission.

23. Each above referenced HUMANA entity is doing business in the State of Florida and is engaged in and the activities of which affect interstate and foreign commerce.

24. HUMANA is a Medicare Advantage Organization [MAO] which has had a contract with TRANSATLANTIC, LLC to render services under and pursuant to the Medicare MAO Part C Program. [Contract - Attachment A; reference to attachments and exhibits herein are to those already filed in this matter unless otherwise indicated]

25. TRANSATLANTIC, LLC is a Limited Liability Corporation acting as a Management Service Organization [MSO]/Independent Practitioners Association [IPA] which is incorporated in Florida and doing business in Tampa, Florida and has had downstream contracts [subcontracts] with various medical groups to render services under the Medicare Part C program.

26.   Federal funds are used to pay for services under this contract.

27.   Over a million dollars of federal funds is being illegally held by HUMANA without an accounting. Some of these funds belong to the United States and some of these funds belong to Plaintiff, TRANSATLANTIC.

28.   The Medicare program is a federal health care program providing benefits to persons who were over the age of 65 or disabled [Title XVIII of the Social Security Act; 42 USC 1395 et seq.]. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

29.   Medicare is a "health care benefit program," that is provided under Parts A, B, C and D as set out by Title 42, United States Code, Sections 1395c; 1395j; 1395w-21 and 1395w-101.

30.   The relevant time for this Complaint is from on or about February 6, 2006, to the present.

### The Medicare Program

31.   The Medicare program includes coverage under three primary components, hospital insurance ("Part A"), medical insurance ("Part B") and drug insurance ("Part D"). Part B of the Medicare program covers the cost of physicians' services and other ancillary services not covered by Part A. Part D covers the costs of most drugs and medicines on an outpatient basis. Part C covers the administration of managed care of the other programs which were traditionally fee for service and which is still available.

32.   Part C provides Medicare managed care programs that are administered by entities known as Medicare Advantage Organizations (MAO). MAOs are under contract to CMS

and have downstream contracts with subcontractors, called Managed Service Organizations (MSO), as well as under various names such as IPA, physician centers, as well as other names. These MSOs in turn have contracts with other MSOs and/or Physician Practices and/or Physician Groups. All of these downstream entities are contractually bound to the terms and conditions established by the MAOs contract with CMS, Medicare's regulations and statutes and such other contract terms as are consistent with the Medicare program and the laws and Constitution of the United States of America. These sub-entities are First Tier, Second Tier, Third Tier subcontractor entities based upon how many contracts away from the MAO the subcontractor is.

33.   Payments under the Medicare Part C program are regularly made by the CMS to an MAO. The MAO receives a percentage for its expenses and profits. The MAO in turn then pays for services rendered by its First Tier Downstream entities with which it is directly contracted. The First Tier Downstream MSO and/or IPA, such as TRANSATLANTIC, earns money from the funds paid to its Downstream   entities. Similarly, that First Tier Downstream entity pays its downstream sub-entities [Second Tier Downstream, Third Tier Downstream, etc.] as well as its' direct services providers until the Medicare reimbursement reaches the service provider who renders the services, rather than to a beneficiary. This occurs when the provider submits a claim to Medicare for payment, through its up-steam entities. These claims are paid either on a fee for service basis or on a capitated basis. If the service provider is not a capitated entity/provider, then the service is paid on an individual fee for service basis. This type of billing often occurs with Specialists who have not accepted capitated reimbursement. If the service provider is compensated as a downstream provider on a capitated basis,

then fees are set and paid based upon the complexity of the patient's healthcare status as determined by the physician's diagnosis of the patient's medical condition, as determined from patient encounters, lab reports and other basis of information, such as Specialist reports. These capitated fees are paid to the physicians on a monthly basis.

34.    Upon certification, the medical provider, whether a clinic, individual, or other health care provider that provided services to Medicare beneficiaries, is able to apply for a Medicare Provider Identification Number ("PIN") for billing purposes. A fee for service (FFS) health care provider who is assigned a Medicare PIN and provides services to beneficiaries is able to submit claims for reimbursement to the Medicare contractor/carrier that includes the PIN assigned to that medical provider. A Medicare claim is required to set forth, among other things, the beneficiary's name, the date the services were provided, diagnosis codes of the patient's medical condition, the cost of the services, and the name and identification number of the physician or other health care provider who had ordered and/or rendered the services. When an individual medical provider is associated with a clinic, Medicare Part B requires that the individual provider number associated with the clinic be placed on the claim submitted to the Medicare contractor.

35.    By becoming a MAO, MSO, IPA, or other participating provider in Medicare, entities and individuals agree to abide by the policies and procedures, rules, and regulations governing Medicare reimbursement and the programs. To receive Medicare funds, participating entities, together with their authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations issued by CMS and its authorized agents and contractors. Health care entities are given

and/or provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

36.  Providers can only submit claims to Medicare for services that they rendered, except that capitated fees are set per enrolled patients per month, based upon the complexity of their medical condition as specified by diagnostic codes. Patient-physician encounter data is submitted to HUMANA so that Medicare Risk Assessment (MRA) diagnoses coding can be established or maintained. Medicare regulations require MAOs, MSOs and health care providers contracted directly or indirectly with Medicare to maintain and cause to be maintained complete and accurate patient medical records to verify that the services were provided as described on the claim form; or for capitated patients, that patients' MRA coding is correct. These records are required to be sufficient to permit Medicare and its contractors, to review the appropriateness of Medicare payments made to the health care provider under Medicare.

37.  When providers identify additional information through subsequently reported test results or otherwise, the provider is required to update his clinical charts and appropriately adjust any reimbursement, encounter record or medical record documentation, without any undue delay.

38.  Under Medicare, services provided are required to be reasonable and medically necessary for the treatment or diagnosis of a beneficiary's illness or injury.

39.  Under a Medicare Advantage program, that Plaintiff was operating under, by contract with HUMANA, payment was made on a capitated basis. Capitation means a set dollar payment per patient per unit of time (usually per month) paid to a physician or physician group to cover a specified set of services and administrative costs without regard to the

actual number of services provided. The services covered may include the physician's own services, referral services, or all medical services. [Medicare Managed Care Manual, Chapter 6]. A patient may not even present at the physician's office for a month or more and the physician will nevertheless be paid his monthly capitation payment for the patient.

40.   Capitated payments are adjusted upward or downward by CMS' Medicare Risk Assessment (MRA). Risk adjustments pursuant to a Medicare Risk Assessment allows CMS to pay plans for the risk of the beneficiaries they enroll, instead of an average amount for Medicare beneficiaries. By risk adjusting plan payments, CMS is able to make appropriate and accurate payments for enrollees with differences in expected costs. Risk adjustment is used to adjust bidding and payment based on the health status and demographic characteristics of an enrollee. Risk scores measure individual beneficiary's relative risk and risk scores are used to adjust payments for each beneficiary's expected expenditures. By risk adjusting plan bids, CMS is able to use standardized bids as base payments to plans. [Medicare Managed Care Manual Risk Adjustment Chapter 7]

## HUMANA'S FALSE AND ERRONEOUS CODING DOCUMENTATION RULES

41.   Primary care physicians are compensated on a monthly capitated basis per patient regardless if the patient receives services during the month or not.

42.    These rates are determined on a two times bi-annual basis.

43.   If a patient has a severe chronic medical condition, then that condition is coded and the physician is entitled to higher funding for that patient on a capitated basis, based upon the severity of the patient's condition, whether services are rendered for that patient in any particular subsequent month or not. The higher funding continues so long as the

severity condition of the patient exists and is reported to continue, via patient encounter with the physician, at least once every six months. These are electronically reported as encounter data.

44. HUMANA established medical documentation rules that are inconsistent with medical standards, HUMANA's contracts with its MSOs and physician groups, Medicare regulations and statutes.

45. HUMANA has established a rule that after 30 days from a patient physician visit, the physician cannot correct his patients' medical records or coding records as to a patient's diagnosis unless the physician has the patient return for a second visit and then it is only prospectively corrected.

46. HUMANA's medical documentation rules contribute in whole or part to the physicians' alleged over-coding of patients' morbidity diagnosis, used to establish MRA diagnosis.

47. A physician may have to wait over 30 days until a specialist report or laboratory test report is returned before he can finalize his diagnosis. This rule would require a second visit from the patient which the patient may not desire to undertake and which visit may be medically unnecessary for the purpose of finalizing the physician's diagnosis after and as the result of, the initial face to face visit with the patient.

48. If the patient does not return within 30 days or if there is a delay in the patient's return visit to the physician, this precludes a timely correction of the medical record. Thereafter, HUMANA can, on review, assert that the physician miscoded the patient's diagnosis.

49. Often patients decline to visit the physician for a medically unnecessary visit and certainly not within 30 days of the initial visit.

50. This can cause overcharging or undercharging of CMS via Medicare reimbursement for a capitated fee of a primary care physician.

51. This can even cause overcharging of CMS via Medicare reimbursement for a fee for service specialist who is seeing the patient based upon an incorrect diagnosis of the primary care physician.

52. HUMANA can, on review, assert that the physician miscoded the patient's diagnosis and caused a greater MRA that resulted in higher payments to the physician.

53. HUMANA requires diagnostic coding on each progress note, even if the patient has a chronic and/or permanent condition.

54. If the permanent and/or chronic diagnosis is not present on the progress note, then HUMANA denies the patient's status, regardless if a severe medical condition exists or not, and down-codes the rate paid and the patient's status.

55. CMS only requires a diagnostic code on a patient's chart once every six months.

56. HUMANA has asserted that the physician miscoded the patient's chart and owes the government funds.

57. HUMANA has then withheld monies from the physician group's service fund without accounting to the physician group or IPA as to the medical audit that caused the withholding to be imposed.

58. On information and belief, often no accounting is made by HUMANA to the MSO/IPA or the physician group as to the medical audit that caused the withholding to be imposed.

59. On information and belief, HUMANA's coding procedures that disregard the patient's true and correct medical status contribute in whole or part to the physicians' alleged over-coding of patients' MRA diagnosis.

60. On information and belief, HUMANA has then withheld funds from the physician's service fund for extensive periods of time and does not properly account to the government or the physician group for the withheld funds or the interest thereon.

61. HUMANA pays cash incentives to its local managers, Directors and Presidents based upon their profit records.

62. On information and believe, the interest earned and the withheld funds contribute to these officials' profit records.

63. Medicare requires that when errors are identified that they are promptly corrected whenever it is determined and a patient's return visit cannot be a precondition for the correction.

64. HUMANA's medical record correction protocol causes inconsistent Medicare capitation determinations and medical chart documentation.

65. HUMANA's protocol even requires the maintenance of incomplete and inaccurate progress notes.

66. TRANSATLANTIC has complained to HUMANA concerning this protocol and asked on several occasions for documentation supporting HUMANA's protocol.

67. HUMANA has not provided to TRANSATLANTIC supporting documentation for this protocol.

## HUMANA'S IMPROPER AND ILLEGAL APPROPRIATION AND IMPOUNDING OF FUNDS

68. Beginning in 2009 and continuing until into 2010, HUMANA has undertaken adjustments against Medicare funds of TRANSATLANTIC and TRANSATLANTIC's downstream affiliated physician centers' (subcontractors) by withholding payment of

service funds on the basis of alleged inappropriate coding by these downstream affiliated centers.

69. HUMANA has withheld and is currently withholding over one million dollars of TRANSATLANTIC's and its downstream providers' funds on the basis of the alleged inappropriate coding, without providing supporting documentation to justify the withholding.

70. On information and belief, this improper and illegal appropriation and impounding of TRANSATLANTIC's and its downstream physician groups' service funds was initiated by Dr. Scott Latimer, then Market President, HUMANA Senior Segment, and approved, endorsed and implemented by HUMANA, INC. Dr. Latimer worked through Ms. Cassandra Ballard, Director of Finance for HUMANA, and employed under Dr. Latimer.

71. Ms. Ballard indicated HUMANA's and Dr. Scott Latimer's position that HUMANA, as an MAO, had Official Right to undertake this appropriation and impounding of TRANSATLANTIC and its downstream physician groups' service funds, even though it was first initiated in 2009, then in 2010, and continues to date, except some funds, an amount to be determined, from 2010 have been returned without an accounting. HUMANA asserts blame upon CMS for the delay in resolving this matter.

72. HUMANA has never paid interest on the funds withheld from TRANSATLANTIC, assuming they pay back some of the principal but without financial documentation of either.

73. On information and belief, the HUMANA acts in this fashion and manner with other MSO/IPAs similarly situated as TRANSATLANTIC.

74. On information and belief, HUMANA does not document their medical audits,

supporting their assertions of inappropriate coding by physician groups.

75. On information and belief, the HUMANA does not document their return of proceeds to CMS arising from alleged inappropriate coding by and payments to physician groups.

76. On information and belief, HUMANA does not pay interest on the funds which they have impounded and withheld from similarly situated IPA/MSOs and physician groups.

77. TRANSATLANTIC denies in substantial whole or substantial part, the alleged inappropriate coding by its affiliated physician centers and asserts HUMANA's illegal coding/documentation rules substantially contributes to any such errors.

78. TRANSATLANTIC has sought and received no confirmation that HUMANA has returned the withheld funds or the interest accumulated on the funds to CMS and HUMANA has not returned any of the 2009 funds to TRANSATLANTIC or its downstream subcontractors and while returning various funds withheld from 2010, never afforded TRANSATLANTIC a financial accounting or medical adjustment accounting to justify their initial and any subsequent withholding of funds for that year. Furthermore, no interest was paid for funds withheld either year.

79. Upon repeated requests, HUMANA has provided no verified documentation to TRANSATLANTIC that contradicts TRANSATLANTIC's understanding that HUMANA has retained the funds and interests for itself in the amount of over one million dollars.

80. It has been between three and four years since HUMANA undertook its adverse 2009 adjustment against TRANSATLANTIC's downstream affiliates' service funds, which affects payments to TRANSATLANTIC.

81. It has been between two and three years since HUMANA undertook its adverse 2010

adjustment against TRANSATLANTIC's downstream affiliates' service funds, which affects payments to TRANSATLANTIC.

82. As to the 2010 service fund withholdings, HUMANA has since remitted approximately one half a million dollars or more to TRANSATLANTIC but paid no interest thereon and provided no verified documentation that the balance was paid to CMS, no financial accounting as to funds initially withheld and no medical accounting justifying the initial withholding of funds.

83. On a number of occasions, TRANSATLANTIC's personnel have sought to confirm the status of these withheld funds.

84. Based upon HUMANA's failure to appropriately respond, HUMANA has not returned various service funds withheld to TRANSATLANTIC or paid them to CMS nor has HUMANA accounted for these service funds or the interest upon them. The exact amounts are unknown due to TRANSATLANTIC's failure to provide documentation to justify its actions.

**CORRECTIVE ACTION PLANS**

85. A Corrective Action Plan in the healthcare industry is understood to be an agreed upon cure for a contractual or program violation that if successfully accomplished results in the party's continuation in the program or contract.

86. On or about August, 2010, HUMANA and TRANSATLANTIC agreed upon a Corrective Action Plan. TRANSATLANTIC successfully completed its CAP with HUMANA and continued its contract with HUMANA.

87. On or about March, 2013, TRANSATLANTIC self reported to Dr. Scott Latimer, then Market President, Senior Segment for HUMANA, that TRANSATLANTIC had

previously, a number of years ago, committed a technical violation of the Part C Medicare Program in that it contracted  a downstream physician group with more favorable financial treatment than is standard and it did not report the deviation contract provision to HUMANA even though it could have otherwise been written lawfully, according to Dr. Latimer, if it had been appropriately disclosed. This more favorable treatment was as a result of arms length negotiations with this service provider and not due to any improper affiliation connection with TRANSATLANTIC. This inappropriate treatment resulted in financial costs to TRANSATLANTIC and not to CMS nor to HUMANA.

88. The extra payments were based upon objective quality of care criteria which the physician group achieved.

89. On or about April 25, 2013, HUMANA placed TRANSATLANTIC on an agreed upon CAP [Exh. #3], as a consequence of its failure to report in a timely fashion the contract deviation.

90. The CAP is understood in the industry and by TRANSATLANTIC to be a contract. If TRANSATLANTIC successfully fulfilled its CAP requirements, then TRANSATLANTIC would have its MAO downstream contract with HUMANA continued.

91. TRANSATLANTIC has not violated its CAP of April 25, 2013, and HUMANA has never alleged that TRANSATLANTIC violated its CAP of April 25, 2013, [Exhs. #5, 6 &10]

### RETALIATORY TERMINATION OF CONTRACT BY HUMANA

92. TRANSATLANTIC has regularly sought a status report as to the funds withheld by

HUMANA, as to whether they had been repaid to CMS, when they would be paid back to TRANSATLANTIC and to be provided supporting documentation as to the withheld funds.

93. TRANSATLANTIC has questioned HUMANA personnel expressing concerns about HUMANA's illegal diagnosis documentation correction rules.

94. Prior to this litigation, no appropriate information had been provided concerning withheld service funds and no verifiable documentation had been provided. Since the inception of this litigation, no verifiable documentation has been provided.

95. After having previously placed TRANSATLANTIC on a CAP, on June 24, 2013, HUMANA breached its CAP agreement and terminated TRANSATLANTIC's contract under the guise of a Mutual Consent Termination Letter [Ex. #6] without the occurrence of any new cause or violation of the CAP.

96. This termination was in breach of the CAP agreement and in retaliation for TRANSATLANTIC seeking to obtain documentation as to the withheld services funds. This termination was in retaliation for TRANSATLANTIC questioning, in the past, HUMANA's illegal diagnosis documentation rules.

97. Dr. Scott Latimer President Marketing Senior Segment of HUMANA arranged for a meeting with TRANSATLANTIC at the offices of HUMANA on June 24, 2013. Dr. Latimer informed TRANSATLANTIC that HUMANA would immediately terminate TRANSATLANTIC for cause or TRANSATLANTIC could enter a Mutual Consent to terminate and be given 60 days prior to the termination of its contract.

98. TRANSATLANTIC was taken by surprise and was not afforded an opportunity to consult with its counsel. It was a take it or leave it moment. TRANSATLANTIC had not

committed any contractual violations, since being placed on its CAP of April 25, 2013, that would constitute cause.

99. TRANSATLANTIC was concerned about the disruption to its Downstream Subcontract Providers if termination was immediate. Additionally, TRANSATLANTIC was concerned about its reputation in the industry, if a for cause termination was applied and executed the 60 day Mutual Consent agreement.

100. HUMANA had no right under its contract with TRANSATLANTIC to terminate TRANSATLANTIC for cause, as occurred herein, without proper notice and opportunity to cure except if cause as defined in Attachment F of the contract between the two or after providing 180 days notice prior to renewal date or 90 days notice for an uncured material breach.

101. HUMANA did not consider the earlier actions, which were subject of the CAP, sufficient cause for immediate termination because the CAP constituted the cure between the parties.

102. On June 25, 2013, TRANSATLANTIC appealed to Dr. Latimer of HUMANA to reverse its termination.

103. On July 1, 2013, Dr. Latimer on behalf of HUMANA denied TRANSATLANTIC's appeal to reverse its termination.

104. In its July 1, 2013, letter to TRANSATLANTIC denying its request to reverse TRANSATLANTIC's termination, HUMANA articulated the reason for the termination and they were all included in the self-disclosure by TRANSATLANTIC and known to HUMANA prior to entering the CAP agreement with TRANSATLANTIC.

105. While this alleged Mutual Consent was executed by TRANSATLANTIC, it was the result

of undue influence by HUMANA which held a confidential relationship with TRANSATLANTIC and its owners. It was the result of undue influence which amounted to over-persuasion, duress, force, coercion and artful and fraudulent contrivances. The Mutual Consent was not voluntary and it was without valid consideration. This Mutual Consent was procured by fraud and deceit as well as coercion. HUMANA obtained this Mutual Consent pursuant to its motives and purposes which are contrary to public policy which was to silence TRANSATLANTIC's complaints concerning HUMANA's operation of its government MAO contract.

106. Dr. Latimer sought to assure the owners of TRANSATLANTIC that to sign the Mutual Consent was best for them. Dr. Latimer had a prior relationship with one of the owners, Ms. Lari Cummings, who had worked for Dr. Latimer and HUMANA in the past. He manipulated that prior relationship to convince her and Mr. Banker (the other owner) that executing the Mutual Consent would be better for TRANSATLANTIC, in the industry, than the negative implications and appearance would be if the termination by HUMANA was for cause.

107. This termination was in retaliation for TRANSATLANTIC's continuous seeking the status of the over one million dollars that should have been returned in whole or part to TRANSATLANTIC, its downstream service providers and/or CMS but none to HUMANA.

108. This termination was in retaliation for TRANSATLANTIC's questioning HUMANA's illegal documentation correction protocol.

109. It is against public policy for HUMANA, while acting in the capacity of a government contractor, to retaliate against someone for complaining or questioning as to how

HUMANA is executing its government contract and illegally and/or improperly withholding funds from TRANSATLANTIC and CMS.

## ILLUSIONARY APPEAL PROCEDURES

110. On or about February 6, 2006, TRANSATLANTIC entered into its IPA agreement with HUMANA [Exh. # 12].

111. Paragraph 20 [IPA-SR-FL/5-98] of that documents affords IPAs a grievance and appeals process.

112. Paragraph 20 is illusory for such a process has not been published in HUMANA's IPA manuals and documentation for IPAs.

113. TRANSATLANTIC could not implement that grievance and appeal process when HUMANA sought the termination of its IPA agreement because that process does not exist.

114. Not having a published process in place when by contract it is suppose to exist, is a false and erroneous misrepresentation.

115. Regulation 42 C.F.R. §422.202 specifically provides for "notice and appeal rights"…for "individual physicians, and the management and members of groups of physicians." TRANSATLANTIC's IPA/MSO status constitutes it as "management … of groups of physicians" [although the regulation focuses on physicians].

116. On July 2 and July 5, 2013, [Exhs. #8 & 9] TRANSATLANTIC's counsel wrote HUMANA and sought to pursue TRANSATLANTIC's appeal rights and arbitration rights as to the legitimacy of HUMANA's termination of TRANSATLANTIC's IPA contract with HUMANA as set out in HUMANA's IPA contract with TRANSATLANTIC.

117. On July 8, 2013, [Exh. #10] HUMANA's counsel wrote and asserted that it would

continue its present course upon which it alleged that both parties agreed and it would not be instituting any appellate or arbitration process.

118. HUMANA's response either assumed the conclusion of the appeal and/or arbitration process so as to not initiate either process and/or reflected a disdain for its contract provisions and obligations.

119. HUMANA is acting as a government contractor and is functioning as a government contractor under a contract that has been approved by CMS as complying with its obligations as a government contractor.

120. HUMANA cannot act in disregard to its contractual obligations in its capacity of implementing its CMS approved contract.

121. HUMANA is acting contrary to its CMS contractual obligations against TRANSATLANTIC by refusing to initiate either the appeal and/or arbitration process.

## CONFLICT OF INTEREST

122. HUMANA owns in whole or part a downstream MSO/IPA subcontractor (ContinuCare) to whom it affords more favorable treatment in the implementation of the Medicare Part C Program to the detriment of other downstream subcontractors.

123. ContinuCare is a downstream MSO/IPA subcontractor of HUMANA.

124. Metrahealth Care Management Corp (Metrahealth) owns ContinuCare and Metrahealth is owned in whole or part by HUMANA or its affiliates.

125. When HUMANA terminated TRANSATLANTIC's downstream contract with HUMANA, it placed on notice the downstream providers and MSO/IPAs of TRANSATLANTIC that they needed to select another MSO/IPA under which to contract with HUMANA by July 15 [thereafter enlarged until the end of July officially while

HUMANA staff continued to press for an early selection of and contracting with alternative MSO/IPAs than TRANSATLANTIC] or they would be reassigned to another MSO/IPA of HUMANA's selection or be discontinued totally from contracting with HUMANA and their patients reassigned to another IPA.

126.   On or about June 28, 2013, Mr. John Barger of ContinueCare (a Metrahealth owned entity) contacted Ms. Lari Cummings of TRANSATLANTIC by phone and subsequently met in person. He indicated to her that ContinuCare was interested in picking up TRANSATLANTIC's downstream physician group subcontractors and staff centers. Mr. Barger was seeking Ms. Cummings' assistance. At the same time, Mr. Barger advised that there could be a place for Ms. Cummings as an employee or independent contractor in and/or with ContinuCare.

127.   Seeking TRANSATLANTIC's physician groups and patients is an improper incentive and basis for HUMANA to terminate TRANSATLANTIC's contract with HUMANA.

128.   TRANSATLANTIC's termination as a HUMANA MS)/IPA was in whole or part based upon HUMANA's desire to transfer TRANSATLANTIC's downstream providers and patients to the HUMANA owned [in whole or part] downstream MSO/IPA, ContinuCare, and other favored MSO/IPA and physician group(s).

## RETALIATION

129.   On or about February 6, 2006, TRANSATLANTIC and HUMANA entered a contract [Exh. #12], providing for the provision of Medicare services under the terms and conditions of the contract, the Medicare program and the laws and Constitution of the United States of America.

130.   HUMANA is acting as a contractor of the United States of America in its implementation

of this contract and the contract it entered with the United States of America     as     a

Medicare Advantage Organization.

131. HUMANA has terminated its contract with TRANSATLANTIC and caused the transfer

of TRANSATLANTIC's IPA subcontractors.

132. HUMANA has caused the termination of its contract with TRANSATLANTIC under the

guise of a Mutual Consent Agreement [Exh. #6]. This termination was the result of the

result of undue influence by HUMANA which held a confidential relationship with

TRANSATLANTIC. It was the result of undue influence which amounted to over-

persuasion, duress, force, coercion and artful and fraudulent contrivances. HUMANA

obtained this Mutual Consent Agreement pursuant to its improper motives and purposes

contrary to public policy.

133. This termination was in retaliation for TRANSATLANTIC seeking documentation as to

the proper disposition of over one million dollars withheld by HUMANA from

TRANSATLANTIC and its subcontractors and/or CMS; TRANSATLANTIC

questioning HUMANA's illegal documentation policy; and HUMANA seeking for

ContinuCare [its subsidiary] TRANSATLANTIC's physician groups.

134. Under the circumstances of this case, HUMANA is doing the above in contradiction and

breach of the terms and conditions, explicit and implied, including good-faith, of the

contract entered with TRANSATLANTIC on February 6, 2006.

135. Under the circumstances of this case, HUMANA is doing the above in contradiction and

breach of the terms and conditions, explicit and implied, including good-faith, of the

contract entered with TRANSATLANTIC on February 6, 2006, [Exh. #12] including but

not limited to Attachment F [Exh. #4] which provides for the term of the contract and

cure for breach thereof.

136. The CAP agreement entered on April 25, 2013, was not only a contract itself but also, a cure for the breach of the February 6, 2006, contract.

137. Under the circumstances of this case, HUMANA is doing the above in contradiction and breach of the Corrective Action Plan [Exh. #3] entered under and the terms and conditions, explicit and implied, of the contract entered with TRANSATLANTIC on February 6, 2006, including but not limited to Attachment F which provides for the term/termination of the contract and cure for breach thereof .

138. Under the circumstances of this case, HUMANA is doing the above in contradiction of the Medicare program, the regulations and statutes governing the Medicare program, and the statutes, regulations and Constitution of the United States of America.

139. HUMANA caused TRANSATLANTIC's subcontractors to select alternative IPAs by July 31, 2013.

140. HUMANA has caused TRANSATLANTIC's subcontractors to be administratively processed so as to implement the Medicare program by September 1, 2013, with these subcontractors but through IPA/MSOs other than TRANSATLANTIC with whom they had previously been contracted with.

141. Under the circumstances of this case, HUMANA is not entitled under the contract, applicable Medicare program provisions and regulations and statutes, the Constitution, laws and regulations of the United States of America, to undertake the above.

## RACKETEERING ENTERPRISE

142. The relevant time period for the racketeering violations complained of herein began

during or about from 2006 and continue until the present and beyond.

143. For purposes of 18 U.S.C. §1962(a) and 18 U.S.C. §1962(b), HUMANA, Inc, is the Defendant herein and the above cited HUMANA affiliated corporations are the enterprise as defined at 18 U.S.C. §1961(4).

144. For purposes of 18 U.S.C. §1962(c), HUMANA, Inc, and each and every of its above cited HUMANA affiliated corporations are Defendants herein and jointly and severally constitute the enterprise as defined at 18 U.S.C. §1961(4).

145. For purposes of 18 U.S.C. §1962(d), HUMANA, Inc, and each and every of its above cited HUMANA affiliated corporations are Defendants herein.

146. HUMANA INC. provides medical management, product management, executive management, information systems management, financial legal and human resources management to its affiliated companies named above. HUMANA INC. and HUMANA Wisconsin provide claims processing, customer service, billing, enrollment and other support services to HUMANA INC.'s affiliated companies named above. HUMANA INC. and HUMANA MARKETPOINT, INC. provide marketing services of HUMANA Medicare risk products to HUMANA INC.'s affiliated companies named above.

147. Through these services, Defendant HUMANA, INC. does exercise control and does exercise direction as to the establishment and operations of the enterprise which engages in and the activities of which affect interstate and foreign commerce.

## PATTERN OF RACKETEERING ACTIVITY

148. A pattern of racketeering arises from at least two acts of racketeering activity, one of which occurred after the enactment of 18 U.S.C, §1961 et. seq. (October 15, 1970) and the other occurring within 10 years of the first violation.

149.    As set forth herein, the Defendants have engaged in and continue to engage in a "pattern of racketeering activity" as defined in 18 U.S.C. 1961(5) by committing and conspiring to commit at least two acts of racketeering activities as described herein within the past ten years.

150.    The Defendants herein did commit and conspire to commit acts of racketeering activity as set out in this complaint that included the follow: violations of 18 U.S.C. §§1341 and 1343 which are mail and wire fraud; violations of 18 U.S.C. §§2314 and 2315 relate to interstate transmitting and transferring of securities and money over $5,000 in interstate and foreign commerce that had been stolen and converted and receipt, possession and concealment of same; and violations of 18 U.S.C. §1951 relates to interference with commerce via extortion under color of official right. These acts were taken in order to carry out and to attempt to carry out; to conduct and to attempt to conduct; to participate in and to attempt to participate in; to control and to attempt to control; to establish and to attempt to establish; to operate and to attempt to operate; to participate in the conduct and to attempt to participate in the conduct; to use and invest in the establishment and operation and to attempt to use and invest in the establishment and operation; and to associate with and to attempt to associate with; all of the foregoing with and as to the enterprises described in this complaint.

## MAIL AND WIRE ACTS OF RACKETEERING ACTIVITY

151.    From during and about 2006 and continuing until the present, the following acts of wire and mail fraud were committed and constitute Racketeering Activity as defined by 18 U.S.C. §1961(5) and prohibited by 18 U.S.C. §§ 1341 and 1343; all in violation of 18

U.S.C. §1962. These were transmitted in interstate commerce for the purpose of executing the scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations. This  Racketeering Activity and the acts committed pursuant thereto resulted, in addition to the  over  one  million  dollars withheld from the service fund, to the loss of TRANSATLANTIC's contract and  to  the loss of the profits therefrom and the ultimate loss of a major portion of the value asset of TRANSATLANTIC in an amount of approximately forty five million dollars.

152.   From on or about 2006 and continuing until the present, HUMANA did devise and intend to devise  a scheme and artifice to defraud and to obtain money and property from TRANSATLANTIC   and   other   MSOs   and/or   physician   groups   by   depriving TRANSATLANTIC and other MSOs and/or physician groups of funds and monies by withholding such funds and monies from TRANSATLANTIC's physician groups' service funds and other MSO's physician groups' service funds and individual physician group's service funds while   asserting false and fraudulent pretenses and representations that HUMANA was entitled to make such withholdings and to continue such withholdings.                .

153.   HUMANA, having devised and intended to devise a scheme and artifice to defraud and obtain money and property by means of false and fraudulent pretenses and representations, did transmit and cause to be transmitted by interstate wire communications writings, signs, signals, pictures and sounds through email and telephonic transmissions for the purpose of executing the scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations.

154.    HUMANA, having devised and intended to devise a scheme and artifice to defraud and obtain money and property by means of false and fraudulent pretenses and representations, did place and cause to be placed mail matter to be sent and delivered by the United States Postal Service.

155.    These wire transmissions occurred by telephone between Florida and Louisville Kentucky.

156.    These wire transmissions occurred by email between Florida and Louisville Kentucky as well as by email these wire transmission occurred in interstate commerce from Florida through other states and back to Florida and from Kentucky to other states and back to Kentucky. These were transmissions were for the purpose of executing the scheme and artifice to defraud and obtain money by means of false and fraudulent purposes.

157.    On or about January 1, 2009, Defendant made and caused to be made, via email or otherwise, a wire communication to CMS seeking disbursement of funding for TRANSATLANTIC and its physician groups. Similarly, on or about the same date, Defendant caused an interstate wire transmission of funds by CMS to Defendant HUMANA into Kentucky from out of Kentucky. Defendant knew that it intended to impose an illegal and unwarranted withhold as asserted herein in the approximate amount of eighty five  thousand seven hundred fifty six dollars and thirty five cents ($85,756.35).

158.    On or about May 1, 2009, Defendant made and caused to be made, via email or otherwise, a wire communication to CMS seeking disbursement of funding for TRANSATLANTIC and its physician groups. Similarly, on or about the same date, Defendant caused an interstate wire transmission of funds by CMS to Defendant HUMANA into Kentucky from out of Kentucky. Defendant knew that it intended to

impose an illegal and unwarranted withhold as asserted herein in the approximate amount of eighty five  thousand seven hundred fifty six dollars and thirty five cents ($85,756.35).

159.   On or about October 1, 2009, Defendant made and caused to be made, via email or otherwise, a wire communication to CMS seeking disbursement of funding for TRANSATLANTIC and its physician groups. Similarly, on or about the same date, Defendant caused an interstate wire transmission of funds by CMS to Defendant HUMANA into Kentucky from out of Kentucky. Defendant knew that it intended to impose an illegal and unwarranted withhold as asserted herein in the approximate amount of eighty five thousand seven hundred fifty six dollars and thirty five cents ($85,756.35).

160.   On or about December 1, 2009, Defendant made and caused to be made, via email or otherwise, a wire communication to CMS seeking disbursement of funding for TRANSATLANTIC and its physician groups. Similarly, on or about the same date, Defendant caused an interstate wire transmission of funds by CMS to Defendant HUMANA into Kentucky from out of Kentucky. Defendant knew that it intended to impose an illegal and unwarranted withhold as asserted herein in the approximate amount of eighty five  thousand seven hundred fifty six dollars and thirty five cents ($85,756.35).

161.   On or about January 1, 2010, Defendant made and caused to be made, via email or otherwise, a wire communication to CMS seeking disbursement of funding for TRANSATLANTIC and its physician groups. Similarly, on or about the same date, Defendant caused an interstate wire transmission of funds by CMS to Defendant HUMANA into Kentucky from out of Kentucky. Defendant knew that it intended to impose an illegal and unwarranted withhold as asserted herein in the approximate amount of one  hundred eleven thousand eight hundred sixty one dollars and eighty five cents

($111,861.85).

162.   On or about December 1, 2010, Defendant made and caused to be made, via email or otherwise, a wire communication to CMS seeking disbursement of funding for TRANSATLANTIC and its physician groups. Similarly, on or about the same date, Defendant caused an interstate wire transmission of funds by CMS to Defendant HUMANA into Kentucky from out of Kentucky. Defendant knew that it intended to impose an illegal and unwarranted withhold as asserted herein in the approximate amount of one hundred eleven thousand eight hundred sixty one dollars and eighty five cents ($111,861.85).

163.   On or about February 7, 2013, Defendant made and caused to be made, via interstate email to TRANSATLANTIC a communication by TRANSATLANTIC to HUMANA where TRANSATLANTIC in the person of Lari Cummings, CEO TRANSATLANTIC, was inquiring of Cassandra Ballard if she had received answers as to her earlier inquiry as to resolving TRANSATLANTIC's (and its physician group) outstanding account. Lari Cummings inquired if Cassandra Ballard had "receive or have any answers yet to my inquiries below?"

164.   On or about March 6, 2013, Defendant made and caused to be made, via interstate email to TRANSATLANTIC communications that HUMANA would resolve TRANSATLANTIC's outstanding account, and just required "a little more time to respond" when the communication was in truth and fact to lull TRANSATLANTIC into not taking action concerning seeking reimbursement funding for TRANSATLANTIC and its physician groups. The email was from Betsy Serrano of HUMANA to Lari Cummings, CEO of TRANSATLANTIC.

165.   On or about January 10, 2013, Defendant made and caused to be made, via interstate

email to TRANSATLANTIC communications that HUMANA did receive its email and

"I will respond as soon as we have answers" when the communication was in truth and

fact to lull TRANSATLANTIC into not taking action concerning seeking  reimbursement

funding for TRANSATLANTIC and its physician groups. The email was  from

Cassandra Ballard of HUMANA to Lari Cummings, CEO of TRANSATLANTIC.

166.   On or about dates to be determined, HUMANA placed in a depository for the United

States mail to be delivered by the United States Postal Service; to wit; MAO executed

contract materials required by and to CMS for the purpose of executing the scheme and

artifice to defraud and to obtain money and property by means of false and fraudulent

pretenses and representations, as herein stated.

167.   Additionally, at various times to be determined, HUMANA false and fraudulently

represented to TRANSATLANTIC, its physician groups and those similarly situated that

it had a right under the color of official right as an MAO to withhold these funds when in

truth and fact, much of the monies and funds that HUMANA withheld, it knew that it did

not have a right to withhold, including the interest thereon.

**INTERSTATE TRANSMISSION AND TRANSFER OF OVER $5,000 IN ACTS OF RACKETEERINGACTIVITY**

168.   From during and about 2006 and continuing until the present, the following acts of wire

and mail fraud were committed and constitute Racketeering Activity as defined by 18

U.S.C. §1961(5) and prohibited by 18 U.S.C. §§ 2314; all in violation of 18 U.S.C.

§1962. These were transmitted in interstate commerce for the purpose of and as part of

the Racketeering Activity described herein. This Racketeering Activity and the acts

committed pursuant thereto resulted, in addition to the over one million dollars withheld from the service fund, to the loss of TRANSATLANTIC's contract and the loss of the profits therefrom and the ultimate loss of a major portion of the value asset of TRANSATLANTIC in an amount of approximately forty five million dollars.

169.   On or about February 1, 2009, prior to causing the transmission and transfer in interstate commerce, HUMANA did intend to convert and steal, securities and funds in an amount greater than five thousand dollars and to be remitted by CMS to HUMANA for payment to TRANSATLANTIC and its physician groups in accordance with the statutes, regulations and contracts which govern CMS's MAO program. Prior to causing the transmission and transfer in interstate commerce, HUMANA intended to apply these funds in a manner not in accordance with CMS' statutes, regulations and contracts for its MAO program.

170.   On or about March 1, 2009, HUMANA did cause to be transmitted and transferred in interstate commerce securities and money of a value greater than five thousand dollars, knowing that this money was being converted and stolen by HUMANA via the same transmission and transfer.

171.   On or about September 1, 2009, prior to causing the transmission and transfer in interstate commerce, HUMANA did intend to convert and steal, securities and funds in an amount greater than five thousand dollars and to be remitted by CMS to HUMANA for payment to TRANSATLANTIC and its physician groups in accordance with the statutes, regulations and contracts which govern CMS's MAO program. HUMANA intended to apply these funds in a manner not in accordance with CMS' statutes, regulations and contracts for its MAO program.

172.  On or about October 1, 2009, HUMANA did cause to be transmitted and transferred in interstate commerce securities and money of a value greater than five thousand dollars, knowing that this money was being converted and stolen by HUMANA via the same transmission and transfer.

173.  On or about February 1, 2010, prior to causing the transmission and transfer in interstate commerce, HUMANA did intend to convert and steal, securities and funds in an amount greater than five thousand dollars and to be remitted by CMS to HUMANA for payment to TRANSATLANTIC and its physician groups in accordance with the statutes, regulations and contracts which govern CMS's MAO program. HUMANA intended to apply these funds in a manner not in accordance with CMS' statutes, regulations and contracts for its MAO program.

174.  On or about March 1, 2010, HUMANA did cause to be transmitted and transferred in interstate commerce securities and money of a value greater than five thousand dollars, knowing that this money was being converted and stolen by HUMANA via the same transmission and transfer.

175.  On or about September 1, 2010, prior to causing the transmission and transfer in interstate commerce, HUMANA did intend to convert and steal, securities and funds in an amount greater than five thousand dollars and to be remitted by CMS to HUMANA for payment to TRANSATLANTIC and its physician groups in accordance with the statutes, regulations and contracts which govern CMS's MAO program. HUMANA intended to apply these funds in a manner not in accordance with CMS' statutes, regulations and contracts for its MAO program.

176.  On or about November 1, 2010, HUMANA did cause to be transmitted and transferred in

interstate commerce securities and money of a value greater than five thousand dollars, knowing that this money was being converted and stolen by HUMANA    via the same transmission and transfer.

## INTERSTATE RECEIPT AND POSSESSION OF
## UNLAWFULLY CONVERTED AND TAKEN SECURITIES AND MONEY
## OF OVER $5,000 ACTS OF RACKETEERINGACTIVITY

177. From during and about 2006 and continuing until the present, the following acts of wire and mail fraud were committed and constitute Racketeering Activity as defined by 18 U.S.C. §1961(5) and prohibited by 18 U.S.C. §§ 2315; all in violation of 18 U.S.C. §1962. These were transmitted in interstate commerce for the purpose of and as part of the Racketeering Activity described herein. This Racketeering Activity and the acts committed pursuant thereto resulted, in addition to the over one million dollars withheld from the service fund, to the loss of TRANSATLANTIC's contract and the ultimate loss of the profits therefrom and the loss of a major portion of the value asset of TRANSATLANTIC in an amount of approximately forty five million dollars.

178. On or about January 1, 2009, HUMANA did receive, possess, and conceal securities and money, in an amount greater than five thousand dollars, which crossed a State boundary after having been unlawfully converted and taken as set out in this complaint, and HUMANA knowing the securities and money to have been unlawfully converted and taken.

179. On or about May1, 2009, HUMANA did receive, possess, and conceal securities   and money, in an amount greater than five thousand dollars, which crossed a State boundary after having been unlawfully converted and taken as set out in this complaint, and HUMANA knowing the securities and money to have been unlawfully converted and

taken.

180. On or about January 1, 2010, HUMANA did receive, possess, and conceal securities and money, in an amount greater than five thousand dollars, which crossed a State boundary after having been unlawfully converted and taken as set out in this complaint, and HUMANA knowing the securities and money to have been unlawfully converted and taken.

181. On or about November 1, 2010, HUMANA did receive, possess, and conceal securities and money, in an amount greater than five thousand dollars, which crossed a State boundary after having been unlawfully converted and taken as set out in this complaint, and HUMANA knowing the securities and money to have been unlawfully converted and taken.

## EXTORTION UNDER COLOR OF OFFICIAL RIGHT

182. From during and about 2006 and continuing until the present, the following acts extortion under color of Official Right were committed and constitute Racketeering Activity as defined by 18 U.S.C. §1961(5) and prohibited by 18 U.S.C. §1951; all in violation of 18 U.S.C. §1962. These acts obstructed and delayed commerce for the purpose of and as part of the Racketeering Activity described herein. This Racketeering Activity and the acts committed pursuant thereto resulted, in addition to the over one million dollars withheld from the service fund, to the loss of TRANSATLANTIC's contract and the loss of the profits therefrom and the ultimate loss of a major portion of the value asset of TRANSATLANTIC in an amount of approximately forty five million dollars.

183. The acts are the same as those cited in the receipt of and possession of unlawfully converted and taken securities and money set out above. On information and belief, this

improper and illegal appropriation and impounding of TRANSATLANTIC's and its downstream physician groups' service funds was initiated by Dr. Scott Latimer, then Market President, HUMANA Senior Segment, and approved, endorsed and implemented by HUMANA, INC. Dr. Latimer worked through Ms. Cassandra Ballard, Director of Finance for HUMANA, and employed under Dr. Latimer. Ms. Ballard indicated HUMANA's and Dr. Scott Latimer's position that HUMANA, as an MAO, had Official Right to undertake this appropriation and impounding of TRANSATLANTIC and its downstream physician groups' service funds, even though it was first initiated in 2009, then in 2010, and continues to date, except some funds, in an amount to be determined, from 2010 have been returned without an accounting. HUMANA asserts blame upon CMS for the delay in resolving this matter.

## RACKETEERING CLAIM I UNDER 18 U.S.C. §1962(a)

184. Plaintiff re-alleges and asserts the allegations contained in the complaint's paragraphs 1 through 183.

185. From during and about 2006 and continuing until the present and beyond, Defendant HUMANA INC., having received income derived directly and indirectly from  pattern of racketeering activity as described in this complaint above, and in which HUMANA has participated as a principal within the meaning of section 2 of Title 18, United States Code, did use and invest directly and indirectly any part of said income and the proceeds of such income in the establishment and operation of the enterprise described in this complaint which is engaged in and the activities of which affect interstate and foreign commerce. This Racketeering Activity and the acts committed pursuant thereto resulted, in addition to the over one million dollars withheld from the service fund, to the loss of

TRANSATLANTIC's contract and the ultimate loss of the profits therefrom and the ultimate loss of a major portion of the value asset of TRANSATLANTIC in an amount of approximately forty five million dollars.

## RELIEF REQUESTED

186. Pursuant to RICO, 18 U.S.C. §1964(c), TRANSATLANTIC is entitled to recover three fold its damages plus costs and attorney fees from Defendant herein.

187. Pursuant to RICO 18 U.S.C. 1964(a), TRANSATLANTIC requests an order of   this Honorable Court to prevent and restrain further and continuing damages to TRANSATLANTIC by Defendants herein by further continuing their injury to TRANSATLANTIC's contract with HUMANA  by   their   unlawful   continuing Racketeering Activity.

## RACKETEERING CLAIM II UNDER 18 U.S.C. §1962(b)

188. Plaintiff re-alleges and asserts the allegations contained in the complaint's paragraphs   1 through 183.

189. From during and about 2006 and continuing until the present, Defendant HUMANA INC., through a pattern of racketeering activity as described in this complaint above, did maintain directly and indirectly an interest in and control of the enterprise which is described in this complaint and which is engaged in and the activities of which affect interstate and foreign commerce. This Racketeering Activity and the acts committed pursuant thereto resulted, in addition to the over one million dollars withheld from the service fund, to the loss of TRANSATLANTIC's contract and the ultimate loss of the

profits therefrom and the ultimate loss of a major portion of the value asset of TRANSATLANTIC in an amount of approximately forty five million dollars.

## RELIEF REQUESTED

190. Pursuant to RICO, 18 U.S.C. §1964(c), TRANSATLANTIC is entitled to recover three fold its damages plus costs and attorney fees from Defendant herein.

191. Pursuant to RICO 18 U.S.C. 1964(a), TRANSATLANTIC requests an order of this Honorable Court to prevent and restrain further and continuing damages to TRANSATLANTIC by Defendants herein by further continuing their injury to TRANSATLANTIC's contract with HUMANA   by   their   unlawful   continuing Racketeering Activity.

## RACKETEERING CLAIM III UNDER 18 U.S.C. §1962(c)

192. Plaintiff re-alleges and asserts the allegations contained in the complaint's paragraphs 1 through 183.

193. From during and about 2006 and continuing until the present, Defendant HUMANA INC., is a person associated with the enterprise as described herein and which enterprise is engaged in and the activities of which affect interstate and foreign commerce. Further, Defendant HUMANA did conduct and participate in the conduct of the enterprises affairs through a pattern of racketeering activity as described in this complaint as set out above.

194. From during and about 2006 and continuing until the present, Defendant HUMANA INC.   and its affiliates as cited in this complaint, are persons both associated with the enterprise as described herein. Further, HUMANA and its affiliates as cited in this

complaint constitute the enterprise as cited herein, which is engaged in and the activities of which affect interstate and foreign commerce. Further, HUMANA and its affiliates did conduct and participate in the conduct of the enterprises affairs through a pattern of racketeering activity as described in this complaint.  This Racketeering Activity and the acts committed pursuant thereto resulted, in addition to the over one million dollars withheld from the service fund, to the loss of TRANSATLANTIC's contract and the ultimate loss of the profits therefrom and the ultimate loss of a major portion of the value asset of TRANSATLANTIC in an amount of approximately forty five million dollars.

### **RELIEF REQUESTED**

195. Pursuant to RICO, 18 U.S.C. §1964(c), TRANSATLANTIC is entitled to recover three fold its damages plus costs and attorney fees from Defendant herein.

196. Pursuant to RICO 18 U.S.C. 1964(a), TRANSATLANTIC requests an order of this Honorable Court to prevent and restrain further and continuing damages to TRANSATLANTIC by Defendants herein by further continuing their injury to TRANSATLANTIC's contract with HUMANA  by  their  unlawful  continuing Racketeering Activity

### **RACKETEERING CLAIM IV UNDER 18 U.S.C. §1962(d)**

197. Plaintiff re-alleges and asserts the allegations contained in the complaint's paragraphs 1 through 183.

198. From during and about 2006 and continuing until the present, Defendant HUMANA and each of its affiliates did combine, conspire and agree together and with each other to

violate subsections 18 U.S.C. §§1962(a), (b) and (c). This Racketeering Activity and the acts committed pursuant thereto resulted, in addition to the over one million dollars withheld from the service fund, to the loss of TRANSATLANTIC's contract and the ultimate loss of the profits therefrom and the ultimate loss of a major portion of the value asset of TRANSATLANTIC in an amount of approximately forty five million dollars.

199. In furtherance of and to effect the object of the foregoing conspiracy the following overt acts were committed:

200. The various acts cited in MAIL AND WIRE ACTS OF RACKETEERING ACTIVITY, cited above;

201. The various acts cited in Interstate Transmission and Transfer of Over $5,000 in Acts of Racketeering Activity, cited above.

202. The various acts cited in Interstate Receipt and Possession of Unlawfully Converted and taken Securities and Money of Over $5,000 Acts of Racketeering Activity as cited above.

203. The various acts cited in Extortion Under Color of Official Right as cited above.

## RELIEF REQUESTED

204. Pursuant to RICO, 18 U.S.C. §1964(c), TRANSATLANTIC is entitled to recover three fold its damages plus costs and attorney fees from Defendant herein.

205. Pursuant to RICO 18 U.S.C. 1964(a), TRANSATLANTIC requests an order of this Honorable Court to prevent and restrain further and continuing damages to TRANSATLANTIC by Defendants herein by further continuing their injury to TRANSATLANTIC's contract with HUMANA by their unlawful continuing Racketeering Activity.

## CLAIM I: DECLARATORY JUDGMENT

206. Plaintiff re-alleges and incorporates Paragraphs 1 through 183 above as if fully set forth and recited herein.

207. On information and belief, HUMANA and its agents have acted with reckless disregards of its obligations under its Medicare Advantage Contract and the Medicare Program.

208. On information and belief, HUMANA and its agents have acted with intent to defraud the United States.

209. On information and belief, HUMANA and its agents have acted in violation of its due care obligations under the Medicare program and its Medicare Advantage Contract.

210. An actual controversy therefore exists between TRANSATLANTIC and HUMANA as to whether HUMANA may undertake the above actions under the circumstances of this case and under the contract, applicable Medicare program provisions and regulations and statutes, the Constitution, laws and regulations of the United States of America.

**WHEREFORE,** Plaintiff TRANSATLANTIC requests that this Court enter its judgment declaring that HUMANA is not entitled under the contract with TRANSATLANTIC to undertake the above alleged actions; including but not limited to termination of this contract, transferring patients and subcontractors from TRANSATLANTIC; and grant such other relief as the Court deems appropriate.  Plaintiff TRANSATLANTIC demands trial by jury on all issues so triable.

## CLAIM II: ACCOUNTING

211. Plaintiff re-alleges and incorporates Paragraphs 1 through 183 above as if fully set forth and recited herein.

212. On information and belief, HUMANA and its agents have acted with reckless disregards of its obligations under its Medicare Advantage Contract and the Medicare Program.

213. On information and belief, HUMANA and its agents have acted with intent to defraud the United States.

214. On information and belief, HUMANA and its agents have acted in violation of its due care obligations under the Medicare program and its Medicare Advantage Contract.

215. As a result of the aforementioned events set out in Paragraphs 1 through 109, HUMANA has received money, a portion of which is due to TRANSATLANTIC from HUMANA, as previously alleged.

216. HUMANA's termination of TRANSATLANTIC's contract was procured in retaliation for TRANSATLANTIC seeking documentation as to the proper disposition of over one million dollars withheld by HUMANA from TRANSATLANTIC and its subcontractors and/or CMS; TRANSATLANTIC challenging HUMANA's illegal documentation policy; and HUMANA seeking for ContinuCare [its subsidiary] TRANSATLANTIC's patients.

217. The specific amount of money due from Defendants to Plaintiff and others is unknown to Plaintiff and cannot be ascertained without an accounting of the withheld funds of the aforementioned events. Plaintiff believes and alleges that the amount due to Plaintiff and Plaintiff's downstream entities exceeds One Million Dollars.

218. Plaintiff has requested on a number of occasions an accounting of the aforementioned withheld funds from Defendants but Defendants have failed and refused, and continue to fail and refuse, to render such an accounting and to pay such sum.

**WHEREFORE**, Plaintiff prays judgment against Defendants HUMANA and each of them, as follows:

(1) For an accounting between plaintiff, its Downstream Entities, CMS and defendants HUMANA;

(2) For the amount found to be due from defendants HUMANA to plaintiff as a result of the accounting and interest on that amount from and after DefendantsHUMANA withheld the funds of Plaintiff and its Downstream subcontractors;

(3) For costs of suit herein incurred;

(4) For such other and further relief as the court may deem proper; and

(5) Trial by jury on all issues so triable.

## CLAIM III: BREACH OF CONTRACT

219.  Plaintiff TRANSATLANTIC re-alleges and incorporates Paragraphs 1 through 183 above as if fully set forth and recited herein.

220.  As a result of the aforementioned events set out in Paragraphs 1 through 109, HUMANA has received money, a portion of which is due to Plaintiff from Defendants, as previously alleged.

221.  On information and belief, HUMANA and its agents breached their obligations under its Medicare Advantage Contract and the Medicare Program.

222.  On information and belief, HUMANA and its agents have acted with intent to defraud the United States.

223.  On information and belief, HUMANA and its agents have acted in violation of its due care obligations under the Medicare program and its Medicare Advantage Contract.

224.  HUMANA's termination of TRANSATLANTIC's contract was procured in retaliation for TRANSATLANTIC seeking documentation as to the proper disposition of over one million dollars withheld by HUMANA from TRANSATLANTIC and its subcontractors and/or CMS; TRANSATLANTIC challenging HUMANA's illegal documentation policy; and HUMANA seeking for ContinuCare [its subsidiary] TRANSATLANTIC's patients.

225. Plaintiff TRANSATLANTIC and HUMANA entered into a Medicare downstream contract on or about February 6, 2006, [Exh. #12].

226. Pursuant to the contract and the Medicare program Plaintiff and its downstream subcontractors were to receive an amount of money for services rendered pursuant to the Medicare program.

227. Defendants HUMANA breached said contract by failing to pay the sum of money as set out herein.

228. On or about April 25, 2013, HUMANA entered with TRANSATLANTIC a Corrective Action Plan [CAP] [Exh. #3] as a consequence of its failure to report in a timely fashion a contract deviation. This CAP constituted a cure agreement pursuant to Attachment F of the February 6, 2006, contract entered between TRANSATLANTIC and HUMANA.

229. The alleged Mutual Consent was executed by TRANSATLANTIC under coercion and not voluntary. It was without valid consideration. This alleged Mutual Consent was procured under fraud and deceit as well as coercion.

230. The termination constituted a violation of the cure agreement [CAP] between HUMANA and TRANSATLANTIC and a violation of Attachment F of the February 6, 2006, contract between TRANSATLANTIC and HUMANA.

231. By reason of Defendants HUMANA's breaches of said contract, Plaintiff TRANSATLANTIC and its subcontractors have sustained damages, including but not limited to the amount of over one million dollars withheld by Defendants HUMANA for services rendered by TRANSATLANTIC's subcontractors.

232. TRANSATLANTIC and its subcontractors have performed all of the conditions precedent under the contract with HUMANA.

**WHEREFORE,** Plaintiff TRANSATLANTIC prays judgment against Defendants HUMANA in an amount to be determined [TBD] but not less than one million dollars, plus interest and costs of this action.  Plaintiff TRANSATLANTIC demands trial by jury on all issues so triable.

## CLAIM IV: INTEREFERENCE WITH CONTRACT AND ECONOMIC OPPORTUNITY

233. Plaintiff TRANSATLANTIC re-alleges and incorporates Paragraphs 1 through 183 above as if fully set forth and recited herein.

234. On information and belief, HUMANA and its agents breached their obligations under its Medicare Advantage Contract and the Medicare Program.

235. On information and belief, HUMANA and its agents have acted with intent to defraud the United States.

236. On information and belief, HUMANA and its agents have acted in violation of its due care obligations under the Medicare program and its Medicare Advantage Contract.

237. HUMANA's termination of TRANSATLANTIC's contract was procured in retaliation for TRANSATLANTIC seeking documentation as to the proper disposition of over one million dollars withheld by HUMANA from TRANSATLANTIC and its subcontractors and/or CMS; TRANSATLANTIC challenging HUMANA's illegal documentation policy; and HUMANA seeking for ContinuCare [its subsidiary] TRANSATLANTIC's patients.

238. TRANSATLANTIC has had valid contracts with its Medicare subcontractors as to whom HUMANA is fully aware.

239. HUMANA was aware of these subcontracts between TRANSATLANTIC and its Medicare subcontractors.

240. These subcontracts were for the specific purpose of effectuating TRANSATLANTIC's Medicare contract entered into with HUMANA.

241. HUMANA, not withstanding TRANSATLANTIC's subcontracts with these downstream entities and various economic opportunities with these downstream entities and other potential entities, intentionally induced some of these downstream entities to terminate their contracts with TRANSATLANTIC, diverting TRANSATLANTIC's patients and downstream entities to transfer there business to ContinueCare, its subsidiary and acted to preclude other entities from affording TRANSATLANTIC economic opportunities.

242. By reason of HUMANA's actions, TRANSATLANTIC has sustained compensatory damages of not less than ten million dollars and including an amount to be determined.

243. By reasons of HUMANA's intentional wrongful actions and that the Defendants HUMANA are multi-billion dollar corporations, they should be assessed substantial punitive damages.

**WHEREFORE,** the Plaintiff, TRANSATLANTIC demands a judgment against Defendants HUMANA in an amount to be determined but not less than ten million dollars in compensatory damages and in an amount of one hundred million dollars for punitive damages, plus interest and the cost of this action. Plaintiff TRANSATLANTIC demands trial by jury on all issues so triable.

## CLAIM V: DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS

244. Plaintiff TRANSATLANTIC re-alleges and incorporates Paragraphs 1 through 183 above as if fully set forth and recited herein.

245. On information and belief, HUMANA and its agents breached their obligations under its Medicare Advantage Contract and the Medicare Program.

246. On information and belief, HUMANA and its agents have acted with intent to defraud the United States.

247. On information and belief, HUMANA and its agents have acted in violation of its due care obligations under the Medicare program and its Medicare Advantage Contract.

248. On information and belief, HUMANA violated clear Constitutional restrictions on the acts of the government and its agents.

249. At all times during the period of this Complaint, HUMANA was acting as an agent of the United States and under the color of law.

250. HUMANA terminated TRANSATLANTIC's Medicare Advantage contract with HUMANA. Without notice or cause.

251. HUMANA deprived and sought to deprive TRANSATLANTIC of its contract rights without affording TRANSATLANTIC due process rights.

252. HUMANA's termination of TRANSATLANTIC's contract was procured in retaliation for TRANSATLANTIC seeking documentation as to the proper disposition of over one million dollars withheld by HUMANA from TRANSATLANTIC and its subcontractors and/or CMS; TRANSATLANTIC challenging HUMANA's illegal documentation policy; and HUMANA seeking for ContinuCare [its subsidiary] TRANSATLANTIC's patients.

253. HUMANA's termination of TRANSATLANTIC's Medicare contract did deprive and seek to deprive TRANSATLANTIC of its contract rights without affording TRANSATLANTIC due process rights in clear violation of its Constitutional rights.

254. On or about April 25, 2013, HUMANA entered with TRANSATLANTIC a Corrective Action Plan [CAP] [Exh. #3] as a consequence of its failure to report in a timely fashion the contract deviation. This CAP constituted a cure agreement pursuant to Attachment F

[Exh. #4] of the February 6, 2006, contract [Exh. # 12] entered between TRANSATLANTIC and HUMANA.

255. HUMANA's termination of its contract of February 6, 2006, with TRANSATLANTIC constituted a violation of the cure agreement [CAP] between HUMANA and TRANSATLANTIC and a violation of Attachment F of the February 6, 2006, contract between TRANSATLANTIC and HUMANA.

256. This constitutes a deprivation of contract and property rights without due process of law.

257. Paragraph 20 [IPA-SR-FL/5-98] of HUMANA's contract with TRANSATLANTIC affords IPAs a grievance and appeals process [Exh. #12].

258. Paragraph 20 is illusory for such a process has not been published in HUMANA's IPA manuals and documentation for IPAs.

259. TRANSATLANTIC could not implement that grievance and appeal process when HUMANA sought the termination of its IPA agreement because that process does not exist.

260. On July 2 and July 5, 2013, TRANSATLANTIC's counsel wrote HUMANA and sought to pursue TRANSATLANTIC's appeal rights and arbitration rights as to the legitimacy of HUMANA's termination of TRANSATLANTIC's IPA contract with HUMANA as set out in HUMANA's IPA contract with TRANSATLANTIC.

261. On July 8, 2013, HUMANA's counsel wrote and asserted that it would continue its present course upon which it alleged that both parties agreed and it would not be instituting any appellate or arbitration process.

262. HUMANA's response arbitrarily and capriciously assumed the conclusion of the appeal and/or arbitration process so as to not initiate either process.

263. HUMANA is acting on behalf of the government and is functioning as a government entity

264. HUMANA cannot act arbitrarily and capriciously in its capacity of implementing its CMS contract.

265. HUMANA is acting arbitrarily and capriciously against TRANSATLANTIC by refusing to initiate either the appeal and/or arbitration process and is depriving TRANSATLANTIC its property rights without due process of law.

**WHEREFORE**, Plaintiff TRANSATLANTIC demands a judgment against Defendants HUMANA in an amount to be determined, plus interest and the cost of this action and such other relief as the Court determines to be appropriate. Plaintiff TRANSATLANTIC demands trial by jury on all issues so triable.


## CLAIM VI: INJUNCTIVE RELIEF

266. Plaintiff re-alleges and incorporates Paragraphs 1 through 183 above as if fully set forth and recited herein.

267. On or about March 2013, TRANSATLANTIC self reported to Dr. Scott Latimer, Market President, Senior Segment for HUMANA, that TRANSATLANTIC had previously, a number of years ago, committed a technical violation of the Part C Medicare Program in that it contracted a downstream physician group with more favorable financial treatment than is standard and it did not report the deviation contract provision to HUMANA even though it could have otherwise been written lawfully, according to Dr. Latimer, and if it had been appropriately disclosed. This more favorable treatment was as a result of arms

length negotiations with this service provider and not due to any improper affiliation connection with TRANSATLANTIC. This inappropriate treatment increased the financial costs to TRANSATLANTIC and not CMS.

268. On or about April 25, 2013, HUMANA entered with TRANSATLANTIC a Corrective Action Plan [CAP] [Exh. #3] as a consequence of its failure to report in a timely fashion the contract deviation. This CAP constituted a cure agreement pursuant to Attachment F [Exh. #4] of the February 6, 2006, contract [Exh. #12] entered between TRANSATLANTIC and HUMANA.

269. TRANSATLANTIC has not violated its CAP of April 25, 2013.

270. TRANSATLANTIC has regularly sought a status report as to the reserve funds withheld by HUMANA as to whether they had been repaid to CMS.

271. On or about June 24, 2013, without a violation of the CAP, HUMANA's President of Senior Segment, Dr. Scott Latimer, having arranged for a meeting at HUMANA's offices with TRANSATLANTIC, did threatened to terminate TRANSATLANTIC's Medicare contract for cause if TRANSATLANTIC did not consent to a mutual termination. Dr. Latimer cited no new cause as a basis for the termination. This would be greatly disruptive for the physician groups which TRANSATLANTIC services. Alternatively, Dr. Latimer would afford TRANSATLANTIC 60 days prior to termination under a mutual consent termination. However, he insisted on the termination and he had the authority to enforce the demand.

272. This alleged Mutual Consent was executed by TRANSATLANTIC under coercion and not voluntary. It was without valid consideration. This Mutual Consent was procured under fraud and deceit as well as coercion.

273. TRANSATLANTIC was taken by surprise and was not afforded an opportunity to consult with its counsel. It was a take it or leave it moment.

274. TRANSATLANTIC had not taken any contractual violation type of actions since being placed on its CAP of April 25, 2013, that would constitute cause.

275. This termination constituted a violation of the cure agreement [CAP] between HUMANA and TRANSATLANTIC and a violation of Attachment F of the February 6, 2006, contract between TRANSATLANTIC and HUMANA.

276. The February 6, 2006, Medicare agreement between HUMANA and TRANSATLANTIC purported in Paragraph 20 [IPA-SR-FL/5-98] of that the agreement to afford IPAs [like TRANSATLANTIC] a grievance and appeals process.

277. Paragraph 20 is illusory for such a process has not been published in HUMANA's IPA manuals and documentation for IPAs.

278. TRANSATLANTIC could not implement that grievance and appeal process when HUMANA sought the termination of its IPA agreement because that process does not exist.

279. HUMANA not having a published appeal and grievance process in place when by contract it is supposed to exist, is arbitrary and capricious as well as fraudulent and deceitful.

280. On information and belief, in addition to being a misrepresentation to TRANSATLANTIC as to its due process rights, it is a misrepresentation to CMS as well.

281. HUMANA obtained this Mutual Consent with TRANSATLANTIC pursuant to its motives and purposes which are contrary to public policy.

282. This termination was in retaliation for TRANSATLANTIC's continuous seeking the status of the over one million dollars that should have been returned in whole or part to

TRANSATLANTIC, its downstream service providers and/or CMS but none to HUMANA.

283. This termination was and is in retaliation for TRANSATLANTIC's contesting HUMANA's illegal documentation correction protocol.

284. This termination was and is in an effort to secure TRANSATLANTIC's patients from its physician centers.

285. This termination was and is arbitrary and capricious and without a modicum of due process.

286. On July 2 and July 5, 2013, TRANSATLANTIC's counsel wrote HUMANA and sought to pursue TRANSATLANTIC's appeal rights and arbitration rights as to the legitimacy of HUMANA's termination of TRANSATLANTIC's IPA contract with HUMANA as set out in HUMANA's IPA contract with TRANSATLANTIC.

287. On July 8, 2013, HUMANA's counsel wrote and asserted that it would continue its present course upon which it alleged that both parties agreed and it would not be instituting any appellate or arbitration process [Exh. #10].

288. HUMANA's response arbitrarily and capriciously assumed the conclusion of the appeal and/or arbitration process so as to not initiate either process.

289. HUMANA is acting on behalf of and is functioning on behalf of CMS as a government entity in implementing its MAO contract.

290. HUMANA cannot act arbitrarily and capriciously and without due process in its capacity of implementing its CMS contract.

291. HUMANA is acting arbitrarily and capriciously against TRANSATLANTIC by refusing to initiate either the appeal and/or arbitration process and by terminating

TRANSATLANTIC.

292. HUMANA's is taking step to speed up the termination of TRANSATLANTIC's downstream contracts even though HUMANA has ostensibly extended until the end of July for the downstream service providers to select the IPA/MSO with whom they want to associate through on and after September 1.

293. HUMANA staff is calling physician groups and pressuring them to make selections and sign agreements as to replacement IPA/MSO for the start of September.

294. HUMANA staff is pressuring physician groups to make their selections and sign agreements by Friday, July 19th as to their replacement MSO/IPAs.

295. On information and belief, various provider physician groups have already made selections and entered contracts with alternative IPA/MSOs.

296. HUMANA is preparing to administratively change these IPA/MSOs associated with these service physician provider groups.

297. In addition, the medical staff is being recruited from TRANSATLANTIC and TRANSATLANTIC's two direct physician clinics. On information and belief, this is the result of HUMANA's efforts.

298. On or about June 28, 2013, Mr. John Barger of ContinueCare (a Metrahealth owned entity) contacted Ms. Lari Cummings of TRANSATLANTIC by phone to set up a meeting with her to discuss a possible place for her as an employee or independent contractor in and/or with ContinuCare to recruit existing affiliates of TRANSATLANTIC to align with ContinuCare.

299. ContinuCare is a downstream MSO/IPA subcontractor of HUMANA.

300. Metrahealth Care Management Corp (Metrahealth) owns ContinuCare; and Metrahealth is

owned in whole or part by HUMANA or its affiliates.

301. Unless immediately enjoined HUMANA's actions will cause TRANSATLANTIC substantial and irreparable harm to TRANSATLANTIC which took years to develop.

302. TRANSATLANTIC was taken by surprise and even though it had not taken any actions since being placed on its CAP of April 25, 2013, that would constitute cause, TRANSATLANTIC was concerned [among many other issues] about the disruption to its Downstream Subcontract Providers if termination was immediate and as a consequence, TRANSATLANTIC executed the 60 day Mutual Consent agreement.

303. While this alleged Mutual Consent was executed by TRANSATLANTIC, it was coerced and not voluntary. This Mutual Consent was procured by fraud and deceit as well as coercion. HUMANA obtained this Mutual Consent pursuant to its motives and purposes which are contrary to public policy. TRANSATLANTIC was taken by surprise and was not afforded an opportunity to consult with its counsel. It was a take it or leave it moment.

304. If the TRO is not issued, then HUMANA will go forward with transferring TRANSATLANTIC's affiliated physicians. This process will destroy the relationship between TRANSATLANTIC and its physician affiliates. Confidence and trust that has taken years to develop will be destroyed and cannot be rebuilt. TRANSATLANTIC's reputation will be tarnish and that cannot be itemized in dollars and cents. These are the intangibles of business that cannot be computed and cannot be repaired. The farther that HUMANA moves the realignment of these relationships, then more irreparable damage that will be done. HUMANA will argue that once the affiliates sign new contracts that they cannot be breached. While this is a faulty argument, it is true that once the relationship between TRANSATLANTIC and its various affiliated physicians is severed

by HUMANA's unlawful conduct, some affiliates are highly likely not to desire to return to TRANSATLANTIC due to misperceptions that will have arisen. The destruction of these relationships is irreparable. The lost relationships constitute lost opportunities for growth in a field of business in a fast evolving environment.

305. Upon suit for a monetary judgment the very first thing that HUMANA will raise is absolute immunity as a government agent. If that does not prevail, then HUMANA will raise the issue of qualified immunity. Again, if that does not prevail, HUMANA will seek to raise higher standards of proof as to obtaining a judgment against it. HUMANA will seek to wrap itself in the same garb as a Medicare Administrative Contractor [MAC] with the need to establish "reckless disregard" or "intent to defraud" pursuant to 42 U.S.C. §1395kk-1. Additionally, HUMANA would seek to claim that it only has to follow a due care standard [42 C.F.R. §421.316]. All of this creates a real possibility that there can be no monetary recovery for TRANSATLANTIC if it is systematically destroyed by HUMANA through its contract termination due to HUMANA's improper motives and purposes. This significant potential monetary immunity makes the injury realistically irreparable unless injunctive relief is issued.

306. TRANSATLANTIC is losing its key staff and HUMANA has even attempted to subvert its CEO, Pilar (Lari) Cummings through the enticements of ContinuCare via John Barger. TRANSATLANTIC is losing its physician at its physician centers and TRANSATLANTIC is losing its patients and reputation in the medical community. To the degree that these could otherwise be compensated for financially, with HUMANA being a governmental agent, it becomes very problematic that any compensatory damages can be gained.

307. When TRANSATLANTIC appealed its termination the very next day [June 25, 2013][Exh. 13#] after the alleged Mutual Consent Agreement for termination was executed [June 24, 2013][Exh. #6] between TRANSATLANTIC and HUMANA, HUMANA responded with a July 1, 2013, rejection letter from Dr. Latimer [Exh. #5]. This letter identified three reasons for TRANSATLANTIC's termination by HUMANA and all three had been previously disclosed to HUMANA by TRANSATLANTIC in its March 2013 meeting with HUMANA and were being cured by the Corrective Action Plan [Exh.#3] previously agreed to between the parties. Therefore, the alleged reasons for the termination given by Dr. Latimer in his July 1, 2013, letter to TRANSATLANTIC were, in fact, a pretextual concealment for the real reason for the termination of TRANSATLANTIC's contract. This contract is subject to termination for limited reasons [Exh.#4] except if it was not renewed as specified in the agreement. The agreement provided for cure and that is what the CAP was. There was no violation of the CAP [See Exh.#3] so there was no lawful basis to terminate the contract. HUMANA has never asserted a breach of the CAP [Exhs. #5, 6 &10]. Indeed, HUMANA breached the CAP by forcing TRANSATLANTIC into the Mutual Consent termination agreement without cause. The real reason for the termination was due to TRANSATLANTIC's exercising its First Amendment Rights. TRANSATLANTIC has consistently sought through written and verbal communications to obtain an accounting from HUMANA as to the one million dollars of funds withheld from TRANSATLANTIC and its affiliated physicians [Exhs. # 1 & 2]. These funds either in whole or part belong to them or in part belong to CMS [government]. It has been two years since HUMANA withheld the funds and has not accounted for them. Because the reasons for the termination had already been

satisfactorily resolved between the parties by the CAP, the excuse given by Dr. Latimer for the termination was just a pretext as is often done to cover wrongful action. Additionally, TRANSATLANTIC has on several occasions questioned the 30 day documentation rule that HUMANA has implemented contrary to CMS rules and procedures.

308. Additionally, HUMANA by its actions is damaging TRANSATLANTIC's First Amendment Rights under the Constitution and that is considered an irreparable injury. TRANSATLANTIC has right to advocate, it has a right to petition its government and all other associated First Amendment Rights. To deprive TRANSATLANTIC of its First Amendment Rights is to undertake irreparable injury to TRANSATLANTIC. This is an additional irreparable injury.

**WHEREFORE,** TRANSATLANTIC request that this Court grant the following relief:

(1)     A Preliminary and subsequently a Permanent Injunction (a) prohibiting HUMANA from terminating of its contract of February 6, 2006, with TRANSATLANTIC; (b) permitting or otherwise facilitating, encouraging, inciting, causing any actions directly or indirectly involved in the transfer of physician groups and patients from TRANSATLANTIC; (c) reinstating TRANSATLANTIC's Medicare Advantage Downstream Physician contracts and prohibiting HUMANA from approving transfer of TRANSATLANTIC's Downstream contractors and patients without further order of this Court;

(2)     A Preliminary and subsequently a Permanent Injunction prohibiting HUMANA, any agent, or entity over which HUMANA exercises control from inciting any employee, agent,

contractor, subcontractor, physician group, client or patient of TRANSATLANTIC or any of its subcontractors to terminate or otherwise lessen or reduce their relationship with TRANSATLANTIC or its subcontractors.

(3)    A Judgment against and ordering Defendants HUMANA in an amount to be determined by this Court as an equitable judgment, plus interest and the cost of this action based upon an Accounting and such other relief as the Court determines to be appropriate.

Furthermore, Plaintiff TRANSATLANTIC demands trial by jury on all issues so triable.

Respectfully Submitted,

PILKA & ASSOCIATES, P.A.
Daniel F. Pilka
Florida Bar No. 442021
Dixie T. Brady
Florida Bar No. 57567
213 Providence Road
Brandon, FL 33511
Telephone: (813) 653-3800 • (863) 687-0780
Fax: (813) 651-0710
Attorneys for Plaintiff
Email: dpilka@pilka.com
      dbrady@pilka.com
      lwadsworth@pilka.com

/s Kenneth Joel Haber
LAW OFFICE OF KENNETH JOEL HABER, PC
Kenneth Joel Haber
12705 Fernberry Lane, Suite A
Boyds, MD 20841
Telephone: (301) 670-0016
Fax: (301) 948-3091
Email: kjhesq@haberslaw.com